## HENRY P. REED AND OTHERS v. VILLAGE OF HIBBING AND OHTERS.[1]

October 21, 1921.

No. 22,336.

**Injunction — vacation of streets and change of railway tracks — conspiracy.**

Plaintiffs, taxpayers and residents of the village of Hibbing, in behalf of themselves and other residents, bring this action to enjoin defendants from doing the acts necessary to be done in order that the defendant, owning the iron ore deposit under the townsite of Hibbing, may mine the same; the claim being that defendants have entered an unlawful conspiracy to vacate the streets, change the route of an electric railway, unlawfully dispose of public property, and have engaged in unfair competition to remove the business and residence portion of the village from the old to a new location therein, it is *held*:

(1) The private interests of plaintiffs will not be invaded by the proposed vacation of the streets in the townsite nor by the mining, so long as the street between them and the mining operation is left safe for public travel. When the mining is so conducted as to constitute a nuisance as to them, it is time to apply for relief and not now.

(2) The finding is sustained that no unlawful conspiracy exists between defendants. No defendant has been shown to intend an unlawful act nor to employ unlawful means in attaining a lawful end, either singly or in unity with some other.

(3) Insofar as plaintiffs are and represent taxpayers, the complaint that the taxes will be increased and property in other parts of the village depreciated by building up the new business center where the mining company intends, must be considered in connection with the situation and the employment and revenue, public and private, to be derived from mining the townsite.

(4) None of defendants intend to take any unlawful step in seeking to vacate the streets. In the vacation both private and public rights

---

[1]Reported in 184 N. W. 842.

can be protected and compensation for injuries given. Defendants cannot be forced in this action to seek vacation of streets.

(5) The franchise under which the defendant railway company occupied a street in the townsite provided for a change of route by agreement. The village council, with the consent of the company, could and did change the route. The change has been approved by the Railroad and Warehouse Commission. It cannot be questioned by plaintiff. It is unnecessary to decide whether the company is a street railway or an interurban railroad.

(6) The threatened sale of the village property has not reached a point where a court should interfere. A village may dispose of its property when occasion arises, unless it was acquired through a grant which forbids a sale.

(7) The alleged unfair competition of the mining company was not proven.

(8) The validity of the ore reservations in the deeds to the lots in the townsite are not properly for consideration on this appeal.

(9) Plaintiffs, not being entitled to an injunction, cannot claim the right to have the court retain the action to award anticipated damages.

(10) There was no error in rulings during the trial, and no abuse of discretion in refusing to grant an amendment to the complaint.

(11) It is not perceived that any violation of the Fourteenth Amendment of the Federal Constitution occurs in denying plaintiffs relief herein.

Action in the district court for St. Louis county to recover damages in the sum of at least $500,000 and to restrain defendants from doing anything in furtherance of a sale of defendant village property or the removal of the village of Hibbing from its present location. The case was tried before Freeman, J., who made findings in favor of defendant and dissolved the temporary injunction. From an order denying their motion for amended findings or a new trial, plaintiffs appealed. Affirmed.

*H. V. Mercer* and *C. G. Anderson*, for appellants.

*Fryberger, Fulton, Hoshour & Zeismer, Davis, Severance & Morgan, Frank D. Adams, Elmer F. Blu, D. T. Collins* and *Washburn, Bailey & Mitchell*, for respondents.

HOLT, J.

The action is to enjoin defendants from carrying out an alleged unlawful conspiracy to destroy, by mining, a part of the village of Hibbing under which is a valuable iron ore deposit. The injunction was denied and from the order denying a new trial plaintiffs appeal.

The 73 plaintiffs are residents and taxpayers in the village. The village and its officers, the Oliver Iron Mining Company, the owner of the ore, and the Mesaba Railway Company, which owns and operates an electric railway into the village, are the defendants. The village was organized in 1893 with 326 inhabitants, but has now a population of over 15,000, and has greatly extended its limits, particularly to the south where the village of Alice has been taken in. Under part, at least, of the original village area was valuable iron ore. A 40-acre tract of the townsite of Hibbing, being the S.W.¼ of the N.W.¼ of section 6, and hereinafter referred to as the townsite, is the territory that has occasioned this lawsuit. On this forty has grown up the business center of the village. An expensive village hall has been built thereon. To the north, east, and west thereof open pit mining has been carried on and progressed to the very edge of the townsite. The pits are excavated to a depth of more than 200 feet. The electric railway enters the village from the north upon a steel bridge spanning an open pit, and passes south on Third avenue through the center of the forty and south through the center of Pillsbury and southern additions. It connects several mining towns on the iron range, Gilbert being its eastern and Hibbing its western terminus.

The owners of this forty dedicated the streets to the public, but in selling lots reserved the minerals and the right to enter upon the surface to explore for and to mine and remove the ore. The defendant mining company has succeeded to the reservations. It has acquired the fee to 90 per cent of the surface, and aims to acquire the balance. Its purpose for a long time has been to so arrange matters that it may be able to mine the ore in that forty. To that end the buildings it owns will be torn down or removed to two platted additions, known as Central and Park, located about 1½ miles south of its ore land, where it is hoped the future business center of the village will be established. It is freely

admitted by the mining company that it intends to mine the ore referred to as soon as it can be done lawfully; that it cannot be so mined until the streets upon this forty are vacated, and hence it will seek their vacation when the time is ripe; that it has opened negotiations for the purchase of the village hall; that it has sought to facilitate the change of route of the electric railway so that it will not traverse any part of the forty, and that it acquired Central and Park additions with a view of moving the buildings from the townsite thereon, and erecting hotels, residences and business blocks for sale or rent to those who might desire to locate there in preference to further north.

We have been favored with exhaustive briefs of over 700 pages, citing an abundance of authorities, and discussing the numerous questions of law and fact which the well known diligence and ingenuity of the learned counsel have injected into the case. But those matters only will be considered which in our judgment are determinative of the question whether an injunction should issue upon the facts found, or upon those facts, if any, that ought to have been found from the evidence.

Plaintiff's right to relief must rest either upon a threatened invasion of their private property interests or their interests as taxpayers and residents of the village. We assume, for the purposes of this decision, that as taxpayers and residents they may maintain an action in protection of public rights, that is, the rights of the village and its inhabitants.

As to any threatened invasion of their private interests, it is enough to state that none of plaintiffs resides upon or does business within the townsite. They are all located on the Pillsbury or Southern additions to the south. The street running east and west between the townsite, the forty in question, and the two additions last mentioned to the south thereof where plaintiffs either reside, do business or own property, is not shown to be threatened with vacation, therefore they cannot be left with cul-de-sac streets. The inconvenience in reaching territory north of Hibbing is an inconvenience common to the public of which plaintiffs cannot complain. Thorpe v. City of Ada, 137 Minn. 86, 162 N. W. 886. Of course any mining operation to the north of the dividing street mentioned must be so carried on that the street will be safe for travel. So long as that condition remains plaintiffs' interests south of the street

are not endangered. At any rate, mining in the north part of the forty can undoubtedly be carried on to a great extent without any direct interference with persons and property in the additions mentioned. In this aspect of the case we agree with the court below that the action is premature.

No court will stop a great mining enterprise, unless it is made to appear that an invasion of private or public right is imminent. Nor do we think there is much substance to the claim that mining could be carried on nowhere in the townsite without constituting a nuisance to plaintiffs. Flying fragments, noise and vibrations from blasting, and smoke and rattle from steam shovels and ore trains, may be so controlled as not to interfere materially with the peace and comfort of residents to the south of the forty. It is reasonable to require those, who take up a business or residence in a municipality dependent for its very existence upon the industry there carried on, to somewhat endure the disturbances and discomforts that unavoidably attend the proper and careful operation of the industry. It cannot now be said upon this record that no mining operations can be carried on in the townsite within the rules enunciated in Brede v. Minnesota Crushed Stone Co. 143 Minn. 374, 173 N. W. 805, 6 A.L.R. 1092, and 146 Minn. 406, 178 N. W. 820, 179 N. W. 638.

It is contended that, in order to remove all its ore in the townsite, the cross street mentioned and a large part of the adjacent additions to the south must eventually be destroyed or appropriated for a slope. Therefore, since plaintiffs have come into a court of equity, the court should retain jurisdiction and ascertain and award the damages which plaintiffs will ultimately suffer for the injury to their property. The short answer to the contention is that, as matters now stand, it is not to be assumed that defendants will so mine that the lateral support of either the street mentioned or of plaintiffs' real estate to the south thereof will be impaired or destroyed. When that is attempted the time is ripe for injunctive relief. There is no way in which this action may be converted into a condemnation proceeding. The mining company has not the right of eminent domain, nor can it be forced to take the property under that right. We conclude that plaintiffs have not shown them-

selves entitled to an injunction or other relief for the protection of any private right of person or property.

The complaint charges a conspiracy between defendants to move the village so as to locate its business center in Central and Park additions upon ground where there is no underlying ore. The finding is that none of the defendants "has combined, arranged, or conspired with any of the other defendants herein to injure the plaintiffs or their businesses or properties, or to accomplish any unlawful end, or any lawful end by unlawful means." We think the evidence amply sustains this finding. The removal and marketing of many millions of tons of ore by the rightful owner must be conceded a lawful and even laudable enterprise. It gives employment, and is productive of revenue for the owner, the nation, the state and the municipality. Has the mining company separately or with the aid of any other defendant resorted to any unlawful means or does it threaten so to do in order to remove this ore? It certainly has done no wrong in buying the surface rights on this forty or in removing the buildings therefrom, or in erecting or encouraging the erection of buildings in a part of the village where no ore beds exist. Nor can a property owner be accused of using unlawful means if he applies to the proper authorities to change the routing of an electric railway operated on streets along or across his land, or takes such steps as the law provides for the vacation of public streets thereon. The mining company disclaimed any intention or threat to disturb any street or bridge over any public road until the same had been legally vacated. The court found this true, and could not well have found otherwise.

Much is made of the fact that an officer of the village, who had begun the erection of an extensive building on lots owned by him in Pillsbury addition, sold his lots to the mining company, and removed the building material therefrom, and erected his building in the new location. There is no evidence to show that this was anything but a legitimate business transaction. The officer, when his attention was called to the new location, appreciated that it was more desirable than the one he had for a business block. It does not appear that the price paid for the new site nor that received for the old was other than the going market price. Nor is there any evidence from which an inference

can be drawn that the village was to yield any rights or that the officer should use his influence to procure any advantage to the mining company because of the deal.

In finding that there was no conspiracy, and in finding that where there was unity of purpose or action between any of the defendants the end was lawful and the means employed to attain such end were not unlawful so far as concerned public interests or the interests of the village, the court could properly consider the fact that the present growth and prosperity of the village is the result of the mining of the ore immediately adjacent thereto; that a continuance of such growth and prosperity depends upon a continuance of this industry; that an immense body of ore underlies the townsite and will furnish employment for years and produce revenue both to the owners of the ore and the public, and that if public improvements in the townsite have to be discarded and new ones made in the new location, involving great expenditure of public and private funds, the burden will fall almost wholly on the mining companies. The findings are that such companies now pay 98 per cent of the municipal taxes, of which the Oliver Mining Company contributes 85 per cent, and that 3,000 of the 15,000 inhabitants are employed in the mining operations in and adjacent to the village. It is also worthy of consideration that the permanent location of the village should be where the use and development of the natural resources will not be prevented. All of the defendants, and especially the village officers, may properly take these matters into consideration, and, from the point of view of the best interests of the public and the municipality, it is not difficult to see benefits greatly exceeding the expense found in the removal and destruction of the townsite buildings, streets and improvements, and the erection of the business buildings, schools, public buildings and homes in a new location.

It will be necessary to note some of the particular facts upon which the claim for equitable relief is grounded, viz., the bridge and streets, the electric railway, the village hall, the mining nuisance, the unfair competition and the mining reservations, for, even though no conspiracy was shown, still, if the conduct of any one of the defendants warrants relief, it should be granted.

Several years ago the mining company, at a cost of over $80,000, erected the bridge across the open pit mine on the north of the townsite. This bridge furnishes the only means of direct ingress and egress to the village from the north. The electric railway also runs thereon. The court found this bridge to be part of the public highway. It is therefore contended it cannot be destroyed or removed. If the streets it connects are vacated, the bridge would no longer serve a public purpose, and no valid objection could be raised to its removal. Whose the salvage will be is not involved on this appeal. And whether the authority to vacate streets in Hibbing is lodged in the village council or the district court, is not necessary to consider. It cannot seriously be doubted that streets in a village may be lawfully vacated. And were it not so, the legislature could surely grant the authority. We need go no further, for the finding and the undisputed evidence are that no mining will be attempted or can be done until the streets are lawfully vacated. If they cannot be, there will be no occasion for demanding an injunction or any of the relief asked for in this action. It may also be suggested that the mining company's present intention to sometime in the future make application for the vacation of the streets on the townsite, does not give plaintiffs the right to force the company to proceed now so to do. This is too plain for argument.

The electric railway obtained a franchise to run cars into the village on certain streets, which franchise has 25 years yet to run. The village council has passed an ordinance permitting the company to change its route into the townsite, so that now, before it reaches the northerly limits of the village, it turns east and skirts the easterly boundaries, avoiding passing over known ore deposits, and then turns westerly and northerly, passing through Central, Park, Southern and Pillsbury additions, terminating at the south townsite line. The railway company, conceiving that it was an interurban railway, also asked for and was granted permission by the Railroad and Warehouse Commission to make the change. The order granting permission was not appealed from, and is now final. If the company is a railroad within the control of the commission the abandonment of the old and the adoption of the new route cannot be questioned at this time. But plaintiffs earnestly contend that it is a

street railway, and hence the Railroad and Warehouse Commission had no jurisdiction to make the order. We need not pass on the status of the railway company, for we have no doubt that the village council has full power to change the routing of the car lines on its streets. In fact, the original franchise contains a provision that by agreement the parties may change the route. The ordinance of 1919, accepted by the company, granted this change. Courts will not interfere with the judgment of the village authorities as to the streets upon which electric cars shall run. The length and conveniency of the new route, as compared with the old, are for the village authorities. It is doubtful whether plaintiffs have any standing to question the change of route of any railway. See Henry v. Ann Arbor R. Co. 116 Mich. 314, 75 N. W. 886.

The negotiations for the sale of the village hall have not reached the point where a court should interpose its arm. The mining company signified to the village council that it was willing to buy, and the council has appointed a committee to ascertain the cost or value of the property. That is as far as matters have progressed. Chapter 149, p. 287, Laws 1891, amending the law under which the village of Hibbing is incorporated, gives the council the power "to receive, purchase and hold for the use of said village any estate, real and personal, and to sell, convey, lease or otherwise dispose of the same." There can be no doubt, under this statute, of the power of the village to dispose of a village-owned building, when, by virtue of its location or inadequacy, it has ceased efficiently to serve the public purpose for which it was built, there being no restrictions against any use or disposition in the grant through which the village derived title. Thompson v. Nemeyer, 59 Oh. St. 486, 52 N. W. 1024; Shaver v. Town of Salisbury, 68 N. C. 273.

We have already covered the alleged mining nuisance. It can hardly be claimed that plaintiffs, as representing the village or the public, may prevent mining operations as a nuisance when they have not made out a case for relief as individuals occupying property as near to the place intended to be mined as any other inhabitant.

We are not impressed with the proposition that the court should have found that the mining company had entered upon a course of unfair competition in attempting to establish the new village center, thereby

causing irreparable injury to plaintiffs as individuals and as members of the community. No false representations were proven against the company. For many years it has been known that it intended to mine the townsite at some time, and in preparation thereof was acquiring the surface rights or fee. Its acquisition of Central and Park additions was no secret, and openly the work of improvements thereon has proceeded, but, apparently, without holding out any inducements for people to there locate, other than the advantage that the place itself and its improvements offered over places further north in proximity to ore beds and mining operations. An individual or corporation, having a peculiar interest in developing a certain part of a city or village, may work toward that end without being charged with unfair competition, even though such development indirectly depreciates values and retards growth in other parts of the municipality, at least, so long as no misrepresentations as to other localities or unfair means towards them are employed. We have discovered no evidence of any unfairness or deception used by any of defendants in the development of the new business center of the village. The mining company had the right to buy the surface rights in the townsite. It had also the right, so far as plaintiffs are concerned, to buy Central and Park additions. In dismantling the townsite and upbuilding the additions, it invades no rights of plaintiffs. Its efforts may not be charged with malice as in the case of Tuttle v. Buck, 107 Minn. 145, 119 N. W. 946, 22 L.R.A.(N.S.) 599, 131 Am. St. 446, 16 Ann. Cas. 807, for the sole purpose is to make it possible to mine its valuable ore deposit, a perfectly legitimate object.

Another claim is that the reservations held by the mining company to the ore under the townsite are void. If that were true it would affect only the price of the village property. As to the other property in the townsite, the company either has the surface, or fee, or intends to acquire it before starting mining. We decline to pass on the validity of the mineral reservations in the deeds through which the mining company claims. It is not necessary for a decision here.

But plaintiffs maintain that, if not entitled to an injunction, the court should nevertheless retain the case to award damages. As already shown, there is no way in which this action may be converted into a

condemnation proceeding. The mining company cannot be forced to mine or to buy plaintiffs out, or pay for anticipated damages in the distant future. In the proceedings to vacate the streets, appropriate damages may be awarded to those entitled thereto. If, after mining operations are started, any public or private rights suffer injury, it is time to call upon the courts for protection or compensation. No nuisance, trespass or wrong, either to private or public property or to persons, has been shown to be impending.

Complaint is made of rulings on the reception of evidence. Whether the mining company is within its corporate powers in buying and improving real estate, cannot have any bearing upon plaintiff's right to relief, and hence the exclusion of the company's articles of incorporation was not error. Nor was it material to plaintiffs' case to show that the mining company blasted a hole in the right of way of the Great Northern Railway Company after it had obtained possession from the Railroad and Warehouse Commission to move its tracks to the south. Testimony from the mining company's officers, regarding their intentions as to the steps to be taken before beginning to mine, was proper to meet the charge that unlawful acts were contemplated or threatened.

There was no error in refusing plaintiffs to amend the complaint so as to litigate the interests of the town of Stuntz which adjoins but is no part of Hibbing.

We see nothing in the contention that, unless the injunction is granted or the anticipated damages that may flow from mining the townsite are adjusted in this action, plaintiffs will be deprived of their property without due process of law in violation of the Fourteenth Amendment to the Federal Constitution. When any one of the plaintiffs shows an injury to his person or property from the acts of defendants, he is entitled to protection and damages, or shows that but for the interposition of the court an irreparable injury will occur to his person or property rights. But no such showing was made. The anticipated injuries to the village and its inhabitants and taxpayers are either too remote or problematic to resort to the remedy of an injunction now, or else it is plain that, in the legal or statutory proceedings, which the mining company must take before it can begin to mine, the law furnishes ample redress.

Whilst the court below in the memorandum stated that it will require the expenditure of enormous sums of money by the municipality to furnish the inhabitants of South Hibbing, that is, the new location, with the same municipal facilities that the residents of Southern and Pillsbury additions now have, such statement is not made a part of the findings. It is not clear what the court refers to. True, the change of the business center or residence center within any village or city involves large expenditures for streets, sidewalks, watermains and the like, but the bulk of these expenditures is borne by the abutting real estate if Hibbing assesses the amount against benefited property as is authorized by the law under which the village organized. There are certain other expenses that must come from the taxpayers generally, such as fire and police protection and the cost of public buildings. If this is what the court means, such cost is incident to the growth and development of any city, where for various reasons the center of population moves and the public buildings and improvements in the old location fail properly to serve the new demands. Who can say whether it is not vastly to the pecuniary advantage of not only Hibbing and its inhabitants and taxpayers, but to the state and nation as well, that every merchantable ore deposit within the village limits be mined and to that end all buildings be moved to some part within its extensive limits where is no ore? The taxes and public revenues derived from mining operations have been enormous in the past and will be hereafter so long as there is ore to mine. And, as before pointed out, the mining companies have so far paid all but a fraction of the municipal expenses of Hibbing.

In passing upon the right or wrong of increased taxation to plaintiffs, it is well to remember that a practice, so general that notice may well be taken thereof, has prevailed in the mining regions of this state, for villages to extend their limits so as to take in every suspected ore body within reach, and without regard to the fitness or need of such territory for business or residence purposes. And this against the most vigorous opposition from the mine and ore owners. Hibbing's dimensions now are, roughly speaking, five miles long and three miles wide, while originally it consisted of but four sections. It is true, the ore body here involved underlies the original village plat, but the policy of Hibbing, like

the other villages, has been to expand so as to embrace adjacent ore lands, and there should rest a reciprocal duty upon the village and its taxpayers to permit these ore lands to be mined when it can be done lawfully, even if some additional public expense incidentally results therefrom. We think the decision of the learned trial court is right under any view of the law and facts of the case.

Order affirmed.