IN RE PETITION OF CELESTINE M. SCHALLER TO VACATE CERTAIN PARTS OF PLAT OF FRONTENAC. TOWN OF FLORENCE, APPELLANT.[1]

No. 30,119.

March 8, 1935.

[1]Reported in 259 N. W. 529, 826.

*Gurnee & Ofstedahl,* for appellant.

*Thomas Mohn* and *Horace W. Mohn,* for respondent.

JULIUS J. OLSON, JUSTICE.

The petitioner, Celestine M. Schaller, pursuant to 2 Mason Minn. St. 1927, § 8244, brought this proceeding to vacate certain portions of the official plat in the townsite of Frontenac, Goodhue county. The trial court made findings sustaining her claim in that behalf and granted substantially all the relief by her asked. The appellant is the town of Florence, in which the platted property known as Frontenac is located. A number of individuals, including the town officers, also the Red Wing chapter of the Izaac Walton League, appeared in opposition to the granting of the petition. After trial had before the court, findings were made and judgment ordered for petitioner. Appellant thereupon moved for amended findings and, if same were denied, for a new trial. These motions being denied, this appeal followed.

There is an interesting history connected with Frontenac, excellently and entertainingly written, in the March, 1933, number of the magazine "Minnesota History," p. 31, under the title, *The Garrard Family in Frontenac.* The first paragraph reads:

"It is impossible to understand the charm of Frontenac unless one knows its history, for the little village is an expression of strong personalities. Few beauty spots in America have been so long in the possession of one or two families and remained untouched by commercialism. This little settlement is located on Lake Pepin, a widening of the Mississippi River which forms the boundary between Minnesota and Wisconsin at this point. The scenery of the upper Mississippi Valley is unsurpassed in the West. High on either side of the river rise palisades of rock or wooded slopes that suggest the banks of the Rhine. Early explorers marveled at its beauty, and the tourist of today responds to its dignity and serenity." And the last sentence, p. 43, reads: "To those who respond

to the atmosphere of Frontenac it is a haven of rest and a place of beauty, the home of a grace and a culture with roots in the past and a flowering in our own age."

To better understand the factual situations confronting us a plat showing the location of that part of Frontenac which is involved in the instant case and also the territory immediately adjacent thereto is herewith submitted.

The townsite was originally designated and known as Westervelt. The plat thereof was filed in the office of the register of deeds of Goodhue county September 30, 1857, thus taking us back to territorial days of the state. The name was later changed to Frontenac by the owners, and the instrument evidencing same was filed in the office of said register of deeds September 13, 1859. Attached to and made a part of the plat is the dedication made by the then owners. This recites that the owners "do hereby dedicate to Public use the Streets and Alleys as laid out, also the Three Parks, the Valhalla, the Delta, the Wakondiota. We also dedicate to public use the Lake Shore between Blocks 9 & 13 to be used as a Steamboat Landing, reserving to ourselves all rights of wharfage and all rights and privileges of Ferry either within the above limits or elsewhere, either at the ends of the streets or within the boundaries of Lots which run to the water."

The statutory provisions then in existence and as such controlling respecting the effect of the dedication were (G. S. 1849-1858, c. 26, §§ 1 and 5):

"Sec. 1. When any person wishes to lay out a town in this territory, or an addition or subdivision of out lots, such person

Note: Lake avenue extends from the southerly (lower) to the northerly (upper) part of the plat and occupies the area between Valhalla park and the shore of Lake Pepin from block 9 to block 2 and thence extends northerly between blocks 1 and 2, as its easterly, and blocks 10 and 11, as its westerly, boundaries. Frontenac Point, the area involved on this appeal, is that part of the plat within the shaded lines lying to the east of blocks 10 and 11 and extending into the lake. The lake shore dedicated to public use "for a steamboat landing" includes that part of the shore line extending from block 9 on the south to block 13 on the north.

shall cause the same to be surveyed, and a plot thereof made, which shall particularly describe and set forth all the streets, alleys, commons or public grounds, and all in and out lots or fractional lots, within, adjoining, or adjacent to said town, giving the names, width, courses, boundaries and extent of all such streets and alleys."

"Sec. 5. When the plot or map shall have been made out and certified, acknowledged and recorded as required by this chapter, every donation or grant to the public or any individual or individuals, religious society or societies, or to any corporation or body politic, marked or noted as such on said plot or map, shall be deemed in law and equity a sufficient conveyance to vest the fee simple of all such parcel or parcels of land, as are therein expressed, and shall be considered to all intents and purposes a general warranty against such donor or donors, their heirs or representatives to said donee or donees, grantee or grantees, for his, her or their use, for the ,uses and purposes therein named, expressed and intended, and no other use and purpose whatever; and the land intended to be for the streets, alleys, ways, commons or other public uses in any town or city, or addition thereto, shall be held in the corporate name thereof, in trust to, and for the use and purposes set forth and expressed or intended."

In substance and effect the same statutory provisions have been carried forward in our later statutes. See G. S. 1866, c. 29, §§ 1 and 5; G. S. 1878, c. 29, §§ 1 and 5; G. S. 1894, §§ 2303 and 2308; R. L. 1905, § 3365; G. S. 1913, § 6855; 2 Mason Minn. St. 1927, § 8236.

Lake Pepin is "an expansion of the Mississippi River between Goodhue and Wabasha counties, Minn., and Pierce and Pepin counties, Wis., 60 miles below Saint Anthony's Falls, covering an area of 38½ square miles. It is nearly 22 miles long and two and one-half miles across at its greatest width. Its greatest depth is 56 feet, but the usual depths are from 25 to 30 feet. The lake was undoubtedly formed by a natural dam or delta deposited by the Chippewa River, flowing in from the east. The swifter current of the latter river enabled it to bring down material too heavy for

the slower stream to remove. The gorge of the Mississippi at this point must have been over 50 feet in depth. Along the shores are vertical cliffs of limestone reaching 500 feet in height and weathered into picturesque spires and turrets, and castellated battlements, and is surrounded by cliffs." 21 Encyclopedia Americana, p. 563.

Frontenac Point, hereinbefore referred to, over a period of perhaps more than 60 years was the principal landing place of steamboats and other river craft in this area. The land rises immediately back thereof, and upon it was built what was known as Lakeside Hotel, now known as Frontenac Inn, a favorite gathering place for summer tourists. Upon the advent of railroads, one on the Minnesota side and another on the Wisconsin side of the river, the usefulness of this point gradually decreased as railroad traffic supplanted and took over traffic that had been formerly carried upon the Mississippi. During the time of river traffic Frontenac boasted of several mercantile and other establishments. But it always has been more of a summer resort than a place of mercantile or business enterprise. The town of Florence has at the present time something like 700 inhabitants who reside there permanently. In the summer season there are a great many more. The petitioner herein in 1907 acquired the old Inn and since then has greatly beautified this location and has done much to make it an attractive place for summer tourists. She has been active, energetic, and truly enterprising in this respect. The property owned and controlled by her is well maintained. She has spent large sums of money not only in acquiring the lands but also in making extensive and valuable improvements. She has caused tennis courts to be constructed, has planted trees and shrubbery, and has gone extensively into beautifying the place, Frontenac Point, now sought to be vacated by her.

In addition to the business carried on by petitioner, there are several summer cottages, and it is a much frequented location for those who seek the restfulness of a Minnesota summer resort. It is, as hereinbefore suggested, one of the beauty spots of our state. Frontenac Point is virtually the heart of this area. It appears

that the public has regularly used the lake shore, described in the dedication upon the plat as "a steamboat landing," for boating, fishing, and similar recreational purposes. It is a favorite bathing beach. Petitioner has caused the lake shore adjacent to her property holdings to be cleared and kept neat and attractive. The public authorities have not been as energetic in this behalf as might be desired. Because of the large amount of her investment and her desire to improve the favorable conditions provided by nature, there is little doubt that she has been the principal cause in the maintenance of this old historic spot and in beautifying the same, a situation that perhaps would not have taken place if public officers alone had the thing in hand. The court vacated all of the area shown upon the plat within the shaded lines east of Lake avenue, thereby granting to petitioner practically all the relief sought and vesting in her complete title to the so-called Frontenac Point to the exclusion of the public. The basis for decision below is finding number six, which reads:

"That steamboats prior to the building of the railroads used part of the said above described property adjoining Blocks One (1) and Two (2), and 'A' and 'B' for landing places; that such use grew less and less frequent up to the year 1917, and that the said property was abandoned as a steamboat landing in the year 1917, and has not been used as such since that time, and that the Lake Shore so dedicated, has been abandoned, and is useless for the purposes for which it was dedicated, to-wit: For a steamboat landing."

That finding is really the pivotal point in this case as viewed by the court below. This is emphasized by the memorandum attached to the order denying appellant's motion for new trial. In commenting upon the "old swimming place" located upon a part of the lake shore ordered vacated by the court, the memorandum proceeds:

"It would also seem that no one, except those desiring to use the place for 'steamboat landing' purposes, have a right to use any of the beach east of Lake Avenue, and that the petitioner, who is the owner of valuable property, and entitled to its use, would have

a right to prosecute each and every person crossing any of the property east of Lake Avenue, as trespassers, and especially so if they so conducted themselves on this 'steamboat landing' property as to be a nuisance. To bring a number of these actions would entail considerable annoyance and expense on the part of petitioner and to the public, and would probably result in shutting off all access to the lake on the part of the public."

We think the learned trial court erred in arriving at the conclusion reached. It seems obvious to us that what the donors intended was to convey to the public for its use all of Lake avenue, including as well all the property fronting upon the lake at Frontenac Point. It will be observed that the easterly boundary of block 9 (toward the southerly end of the plat) is a street which has for its easterly boundary the lake shore of Lake Pepin. Everything points to a general donation or grant to public use of all the areas not surveyed into lots and blocks. The provision in respect of steamboat landing can refer to no more than the point or area where water and land meet, that is to say, the "lake shore." It is unreasonable to suppose that the dedication in respect of steamboat landing made for naught the prior general grant in respect of the public use indicated by the plat. The right to land steamboats was but an additional burden or limitation placed upon the use of that part of the street or public place forming the lake shore so as to permit the landing of passengers and goods from steamboats for further transportation. Conceding that the court was right in holding that the lake shore had not been used for steamboat landing purposes over a period of some 17 years, yet that would not, as we view the situation, at all interfere with the right of the public to the possession for use of Lake avenue and the other streets and public places bordering upon the lake. The steamboat landing provision cannot be said to be in denial of the general grant. The donors limited the special designation to the "lake shore" knowing that the location of the "shore" would necessarily vary from year to year and perhaps from month to month depending upon the stage of water in the lake. As practical men they sought to advance the means of transportation in furtherance of

the development of commerce. As owners of the townsite they naturally sought to attract business. It was to their advantage to permit the landing of passengers and cargoes in the most direct and least expensive way.

Lake Pepin being inland water and as such not governed by the definition of "shore" or "shore line" as applied to tide water, the authorities are in general agreement that the shore or shore line is the space between high and low water mark. See 4 Wd. & Phr. (2 ser.) p. 575.

" 'Shore line' does not mean the meander line, as the meander line is frequently run on the top of the bank, often many feet above the usual water line reached by the river during ordinary seasons. This term has usually been used to mean, in natural fresh water rivers, low-water mark, and grants bounded by the shore extended to that line, making the water's edge at low water the boundary." [Citing cases.] *Id.* p. 576.

For other definitions of "shore" and "shore line" see 7 Wd. & Phr. (1 ser.) pp. 6495-6497.

This court in Village of Wayzata v. G. N. Ry. Co. 50 Minn. 438, 442, 52 N. W. 913, 914, had for consideration a similar situation in respect of a street bordering upon the shores of Lake Minnetonka. In referring to the plat where the shore line was one of its boundaries, the court said:

"There is nothing else to indicate it but the natural object, the lake; and that must be taken to have been the boundary intended. We know of no rule for determining the extent of a grant or dedication of land to public use, where a navigable lake or river is adopted as one of the boundaries, other than that applied in the case of a private grant. Where, in a private grant, the land is bounded only by navigable water, the grantee takes to the low-water mark,—[citing cases]—and the riparian rights go with the upland. Where the grant or dedication to the public is for the purpose of passage, and goes to the water, the conclusion—there being no indication of a contrary intention—is inevitable that the grant or

dedication was intended to enable the public to get to the water for the better enjoyment of the public right of navigation."

In Patterson v. City of Duluth, 21 Minn. 493, 496, the court said: "The statute makes the plat operate as a conveyance of any donation or grant to the public * * *." In Downer v. St. P. & C. Ry. Co. 22 Minn. 251, 252, it is said: "It [statutory dedication] operates, not by way of estoppel, as is the case with a common law dedication, but as a grant—by force of the statute, from whose provisions alone it derives its existence and operative effect." In City of Winona v. Huff, 11 Minn. 75 (119), 81, the court said: "* * * the statute would seem to constitute the plat the operative instrument * * *." And in the same case it was held that [11 Minn. 76] "where land is dedicated by town plat for public squares, streets, or levees, the corporate authorities may maintain ejectment for it." In Lamprey v. State, 52 Minn. 181, 192, 53 N. W. 1139, 1140, 18 L. R. A. 670, 38 A. S. R. 541, it was said that "* * * a meander line is not a boundary, but that the water whose body is meandered is the true boundary, whether the meander line in fact coincides with the shore or not." The same case holds [52 Minn. 193] that where a grant of land is bordered by a navigable body of water the grantee takes the fee only to high water, "but with all the riparian rights incident to the ownership of riparian land, including the right to accretions and relictions." That case reviews numerous decisions of this and other courts. It has been cited with approval in many subsequent cases, amongst which are Shell v. Matteson, 81 Minn. 38, 83 N. W. 491; Hanson v. Rice, 88 Minn. 273, 92 N. W. 982; Scheifert v. Briegel, 90 Minn. 125, 96 N. W. 44, 63 L. R. A. 296, 101 A. S. R. 399; Burton v. Isaacson, 122 Minn. 483, 142 N. W. 925; State v. Korrer, 127 Minn. 60, 148 N. W. 617, 1095, L. R. A. 1916C, 139. In Tyler, Law of Boundaries, p. 170, the author states: "Everything essential to the beneficial use and enjoyment of the property designated is, in the absence of language indicating a different intention on the part of the grantor, to be considered as passing by the conveyance." This state has repudiated the old common law

doctrine that the state has any private or proprietory right (as had the King) in navigable waters, but "holds them in its sovereign capacity, as trustee for the people, for public use." Lamprey v. State, 52 Minn. 181, 198, 53 N. W. 1139, 1143.

Whether this very desirably located area, solemnly dedicated to public use, should be restored to private ownership and thus, perhaps for all time to come, lost to the public and made an appendage to private enterprise for individual profit or enjoyment, or both, is a matter that should receive our most careful consideration. The present trend of public opinion is directed toward restoring to the public access to our lakes, our parks, and our forests, for recreational and other proper uses. That is why "the final test is whether the public interests will or will not be best served by discontinuing the way." In re Vacation of Part of Town of Hibbing, 163 Minn. 439, 447, 204 N. W. 534, 537, 205 N. W. 613. In Reed v. Village of Hibbing, 150 Minn. 130, 184 N. W. 842, this court held that a plat may be vacated only when it shall be made to appear that such vacation will prove beneficial to the public interests. In the instant case not a single witness claimed that there was any possible benefit accruing to the public by the proposed vacation. As a matter of fact petitioner with commendable frankness testified:

Q. "Do you know of any benefit which the public would obtain from the vacation of this plat?

A. "No, I do not think that the public would gain any benefit from it, but I do think that I would. That one street there, Agate street, is only one block long, and I do not see what the public needs of that one block of street. What good will it do them whether they derive any benefit from it or whether they do not?"

Nor do we believe that the evidence justifies the conclusion that the public has abandoned the streets, alleys, and other public places here involved. Even if it be assumed that abandonment may ever be the cause of loss of an easement for street purposes, yet we are persuaded under the holding of this court in Parker v. City of St. Paul, 47 Minn. 317, 318-319, 50 N. W. 247, 248, that abandonment has not been established in this case.

"The rights of the public are seldom guarded with the degree of care with which owners of private property guard their rights, and, consequently, acts or omissions which might weigh heavily against private persons cannot always be given the same force against the public. Moreover, streets, levees, and the like are often laid out on land acquired for or dedicated to such purposes with reference to future as well as present requirements, and therefore it is not legitimate to assume that the property has been abandoned merely because it has not yet been used by the public. It may also be safely laid down as sound, both upon reason and upon considerations of public policy, that until the time arrives when a street, levee, or the like is required for actual public use, and when the public authorities may be properly called upon to open or prepare it for such use, no mere nonuser for any length of time, however great, will operate as an abandonment."

See also 19 C. J. p. 942, § 151, and cases cited under note 31; Coffin v. City of Portland (C. C.) 27 F. 412, 416-417.

A statutory dedication is effective without acceptance by the public. 2 Dunnell, Minn. Dig. (2 ed.) § 2628; Keyes v. Town of Excelsior, 126 Minn. 456, 148 N. W. 501.

Order reversed.

DEVANEY, CHIEF JUSTICE (dissenting).
I dissent.

HOLT, JUSTICE (dissenting).
I dissent.

ON APPEAL FROM CLERK'S TAXATION OF COSTS.

On April 5, 1935, the following opinion was filed:

Costs—rights of prevailing party.

PER CURIAM.

This is an appeal from the clerk's taxation of costs and disbursements. The appellant was the prevailing party. Respondent "objects to the allowance or taxation of any and all costs against her herein, on the ground that said cause is a special proceeding, and no costs are allowable by the statute." The proceeding was

one to vacate certain public grounds at Frontenac under 2 Mason Minn. St. 1927, § 8244. There is no question that the proceeding is special, nor is there any doubt that under this section no provision is made for recovery of costs. Respondent cites 2 Dunnell, Minn. Dig. (2 ed. & Supp. 1932) § 2198. In two of the cases cited by Dunnell, namely, Andrews v. Town of Marion, 23 Minn. 372, and Kroshus v. Town of Houston, 46 Minn. 162, 48 N. W. 770, costs and disbursements were taxed in favor of the prevailing party here although this court in both cases held that the trial court erred in permitting costs to be taxed below. The rule announced by Dunnell relates to allowance of costs and disbursements in special proceedings in the district court.

2 Mason Minn. St. 1927, § 9486, regulates costs and disbursements here. The allowance of statutory costs is discretionary with the court, but this is not true respecting necessary disbursements. The last sentence of that section reads:

"In all cases the prevailing party shall be allowed his disbursements necessarily paid or incurred."

It will be noted in the instant case that there is no question respecting the accuracy or necessity of the items of disbursements, respondent's objections going to the right to tax, not to the amount. In Bayard v. Klinge, 16 Minn. 221, 234 (249) in the last paragraph of the opinion the court said:

"Costs are not involved in a contest as to the election to office * * * till it has been removed to the supreme court."

And in Kretz v. Fireproof Storage Co. 127 Minn. 304, 149 N. W. 648, 955, it is held that there is no discretion as to the allowance of proper disbursements. To the same effect see 2 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 2239.

Clerk's taxation affirmed.