(No. 73.)

J. W. RUFUS BESSON et al., executors and trustees of Richard Stevens, deceased, complainants-respondents,

*v.*

THEODOSIUS STEVENS, administrator of the estate of Elizabeth C. Stevens, Jr., et al., defendants-appellants.

---

(No. 74.)

J. W. RUFUS BESSON et al., executors and trustees of Richard Stevens, deceased, complainants-respondents,

*v.*

DOROTHY P. STEVENS et al., defendants-appellants.

[Argued November 24th, 1922. Decided March 5th, 1923.]

On appeal from decrees advised by Vice-Chancellor Buchanan, who filed the following opinion:

"Complainants, as executors of the last will and testament of Richard Stevens, deceased, filed two bills, one to determine the ownership of six hundred shares of stock of the Hoboken Land and Improvement Company and four hundred and ten shares of common and one thousand one hundred and sixty-one of preferred stock of Hoboken Paper Mill Company, standing of record in the name of Elizabeth C. Stevens, Jr., and the other a like bill but relating to seven hundred shares of stock of the Hoboken Land and Improvement Company, standing of record in the name of Dorothy P. Stevens. Elizabeth C. Stevens, Jr., died intestate shortly after the bill was filed and the suit was revived as against her administrator. Both suits were tried together. There is no dispute over

the principles of law involved, nor over the facts susceptible of direct proof; the controversy is as to inferences of fact and as to the application of the legal principles to the facts.

"It appears from the evidence and the admissions in the pleadings that the testator, Richard Stevens, was a man of high standing and of large means. His wealth (including the securities in question in this litigation) amounted to about $1,500,000, of which about $1,000,000 was in securities. He died May 18th, 1919, at the age of fifty-one years, after an illness of four days with pneumonia. He left him surviving a widow and four children—Elizabeth, aged twenty-four (at his death); Caroline, twenty-one; Dorothy, sixteen, and Richard, fourteen—of whom Elizabeth and Dorothy are the respective principal defendants in the two suits.

"He was a lawyer, a member of the bar of this state and engaged to some extent at least in active practice. He was also active in business and financial pursuits, being the president of the Hoboken Paper Mill Company, and also of the Hoboken Land and Improvement Company, both 'close corporations' of the Stevens family, in which he had large stockholdings.

"It further appears that the six hundred shares of land company stock and the four hundred and ten shares of paper company stock above mentioned were, prior to the transfers to Elizabeth C. Stevens, the property of the testator; that some time prior to October 1st, 1918, this stock was transferred by the testator to his sister Caroline B. Wittpenn, in trust for certain purposes, one of which was to transfer the stock upon the demand of testator to any person named by him; that Mrs. Wittpenn had no interest whatever in the stock; that on October 1st, 1918, the testator caused the six hundred shares of the land company stock above mentioned to be transferred on the books of the company from the name of Caroline B. Wittpenn to the name of Elizabeth C. Stevens, Jr. Either at this time or later a certificate was issued by the company for said six hundred shares of stock in the name of Elizabeth C. Stevens, Jr. This certificate was placed by the secretary of the company, at the direction of the testator,

in the private compartment of the testator in the safe of the company, where it was found at his death.

"On the 2d day of October a similar transfer was made from Mrs. Wittpenn to Elizabeth C. Stevens, Jr., of four hundred and ten shares of the common stock of the paper company, and certificate No. 36 for said shares was issued in the name of Elizabeth C. Stevens, Jr., and was placed by the secretary of the land company at the direction of the testator in the above-mentioned private compartment in the safe of the land company, and was found there at his death. Both of these transfers were made without consideration and in neither case was the certificate of stock physically delivered to Elizabeth C. Stevens, either at the time of the transfer or at any other time.

"On November 1st, 1918, the paper company, of which the testator was then president, passed a resolution authorizing its president and secretary to issue to Elsie C. Stevens (the name by which said Elizabeth C. Stevens, Jr., was commonly known) a certificate for one thousand one hundred and sixty-one shares of the new preferred stock of the company in exchange for $90,000 par value of bonds of the company and a nine-tenths interest in a bond and mortgage of the company, amounting to $29,728.23, which bonds and mortgage, the resolution states, were then owned by said Elsie C. Stevens, but which were in fact owned by Richard Stevens. The preferred stock was duly issued to Elizabeth C. Stevens, Jr., but the certificate was delivered by the paper company to Richard Stevens, who in turn delivered it to Mr. Brown, secretary of the land company, directing him to put it in the land company's safe in the office of that company. Mr. Brown placed the certificate in that safe in the file marked 'Elsie Stevens, Jr.'

"About January 29th, 1919, Elizabeth C. Stevens, Jr., acting at the request of the testator, executed and delivered an assignment of said six hundred shares of stock of the land company unto said Richard Stevens, and also an irrevocable power of attorney authorizing the transfer of said stock on the books of the company to said Richard Stevens or his

nominee. This assignment was fastened by Richard Stevens to the certificate of stock issued in the name of Elizabeth C. Stevens, Jr., above referred to, and was found with such certificate after his death. At the same time, and at her father's request, a similar assignment and power of attorney was executed by Elizabeth C. Stevens, Jr., on the reverse side of the certificate for four hundred and ten shares of the common stock of the paper company; also an assignment and irrevocable power of attorney of the one thousand one hundred and sixty-one shares of preferred stock of the paper company, which was delivered to him and attached by him to the certificate of preferred stock, and so found at his death.

"The financial dealings of the members of the Stevens family were carried on largely, if not entirely, through the land company, which collected the dividends and interest for the several members of the family, depositing them to its own account, crediting them respectively on their several accounts in its books, and from time to time paying out moneys on their respective orders or instructions and debiting their accounts with the moneys so paid out. So, also, their securities, or some of them, were kept in the land company's safe, in separate files or envelopes. Elizabeth came into possession of some securities from her grandmother's estate when she became twenty-one, and a file in the safe was set apart for her securities and an account opened in her name, Elsie Stevens, Jr., on the books of the land company. To her credit in that account were entered the income from the securities just mentioned (collected by the land company), and checks for one-twelfth the annual income were made and sent her by the company monthly and charged against that account. This account and the moneys derived therefrom was used by her solely as a 'dress' or clothing account. Her other expenses were paid by her father as well after her majority as before. (A similar file and account were instituted for Caroline when she became of age.)

"The dividends accruing in October and November, 1918, on the three blocks of stock issued in the name of Elizabeth, were collected by the land company (if it can be said to col-

lect dividends which it pays) and credited to this account of
'Elsie Stevens, Jr.' This was not by any instructions from
Elizabeth, but following the usual custom or routine of the
office and the family. On December 6th, 1918, however, the
testator gave the company written instructions to open a new
account in the name of 'Elsie Stevens, Jr., Special'; to
transfer to it from the 'Elsie Stevens, Jr.,' account the divi-
dends of the preceding three months on the stock in ques-
tion, and to credit it thereafter with all future dividends on
the stock in question. These instructions were carried out,
and all subsequent dividends were credited to the new or
'Special' account, and nothing else was credited therein. No
moneys were withdrawn from this account by the order of
anyone other than the testator, up until his death. During
that period the 'deposits' or credits totaled $16,347.55; and
there was charged against it only $3,245.95—$2,638.20 in
February, 1919, and $607.75 in March. The February
charge of $2,638.20 and $578 of the March charge were for
wines and liquors (mostly whiskey), bought by testator in
the name of Elsie; the remaining $29.75 of the March charge
was the quarterly installment of Elsie's 1918 income tax, due
March 15th. The income tax report for 1918 was not made
up by her but by the land company's office force; it included
in the return the October, November and December dividends
above mentioned. (It may be noted here that there is no
evidence that the October, 1918, monthly dividend on the
land company stock was in anywise paid to Elsie; neither,
however, does it appear that any such dividend was paid by
the land company except by mere presumption from the fact
that such dividends were paid each subsequent month.)

"The testator's will was executed March 7th, 1917. By it
(aside from sundry bequests to persons outside his family)
he gave $28,000 to his youngest two children to equalize
them with what the other two had received from their grand-
mother, gave to each of the four children $50,000 at age of
twenty-four, and left the residue of his estate in trust for
the four in equal shares, all except Elsie to get the principal
of their shares at age forty, Elsie's share being kept in trust

during her life and at her death going to testator's then
living issue.   At the time this will was made Elsie was
desperately ill with nervous collapse and her recovery was
doubtful.   Apparently, it must have been feared by her father
that if she lived she might be nervously or mentally affected
for the rest of her life.   After her recovery he told his wife
he was going to change his will as to the provisions affecting
Elsie, and repeated the statement about six months before
he died.   At his death his will was found open in current
documents on his desk.

"The land company's safe was in that company's office.
It contained, besides property of the land company itself,
files (boxes or envelopes) of the individual property of
members of the Stevens family and others interested in the
company.   Among these was the file or box of Richard Ste-
vens himself; the one of Elsie Stevens, Jr., and the one of
Caroline Stevens.   As to the safe, and, therefore, to all the
contents thereof, Richard Stevens, as president of the com-
pany, had complete access thereto and absolute control there-
over.   Neither Elsie or Dorothy knew the combination, nor
could have had access thereto against the father's consent.
In fact, however, they, or at least Elsie, had free access to the
safe, and hence to everything therein, pursuant to her father's
consent and directions (express or implied).

"At the father's death there was found in his file in the
safe, in addition to the 'Elsie Stevens, Jr.,' certificates of land
company and paper company stock and assignments, as above
mentioned, and the certificate of land company stock in
Dorothy's name (hereafter to be mentioned), four Liberty
bonds marked 'property of Dorothy Stevens,' and one Liberty
bond marked 'property or Richard Stevens, Jr.,' and also a
considerable quantity of title papers and agreements and
securities (principally corporate stocks)—the individual
property of Richard Stevens.   These latter aggregated in
par value approximately $250,000 (the par value of the
'Elsie, Jr.,' and 'Dorothy' stock would be an additional $163,-
200), and included six shares · of paper company common
stock and one thousand two hundred and sixteen shares of

land company stock. Testator also had a safe deposit box at the Hudson Trust Company, wherein was found securities owned by him (principally bonds; no land company or paper company stock) aggregating in par value about $165,-000. The total outstanding stock of the land company was fourteen thousand seven hundred and thirty-nine shares, of which testator had one thousand two hundred and sixteen shares after the transfer of the one thousand three hundred shares to Dorothy and Elsie; the total outstanding common stock of the paper company was eight hundred and seventy-one shares, of which testator held six after the transfer of four hundred and ten to Elsie. The value of these stocks was far above par, for they paid dividends of twenty-five to thirty per cent. a year.

"The foregoing, I think, summarizes the evidence in regard to the stock standing in Elsie's name, except the testimony as to the testator's conversation with Elsie, and his other statements of intention.

"With regard to the seven hundred shares of land company stock standing in Dorothy's name—that transfer was made by testator in April, 1919, from stock standing in his own name, and the certificate was issued in Dorothy's name, dated April 30th, 1919, delivered to the testator and at his direction placed in his box or file in the safe, where it remained at his death, together with an assignment thereof and irrevocable power of attorney, to Richard Stevens, signed by Dorothy, but undated. At the father's instructions an account was opened by the land company on its books in the name of 'Dorothy P. Stevens, Richard Stevens, Guardian,' and the May 1st dividend credited thereon. There were no other credits and no debit entries—his death occurring May 18th. Dorothy had no file or box in the safe.

"Let us now consider the testator's statements, and first in relation to the stock transferred to Dorothy.

"He told Mr. Edwin Brown (who was the secretary of the land company, and evidently also in fact a confidential secretary of Mr. Stevens) to have the transfer of the seven hundred shares made; that he was anxious to have the new cer-

tificate issued prior to May 1st, 1919, 'so that the holder, Dorothy, would receive the dividend on that date.' Dorothy says that her father said to her, at home, a few months before his death, probably January or February, 1919, 'he was going to turn over some stock in my name, and that I wouldn't have anything to do with it, except it would just be in my name, and that he wanted me to sign a paper, which I did, in case I should die, this stock would come back to him; and in case he died it would be divided equally between my sisters and brothers and myself;' that he also said he had 'given' Elsie some stock, or was going to. (The word 'given' was not used by the witness but was in counsel's question.) Mr. Brown also testifies that the assignment back from Dorothy to her father and power to transfer was prepared coincident with the issuance of the stock in her name and taken away by Mr. Stevens for execution by Dorothy and returned by him executed. Elsie Stevens, Jr., testifies that at the time her father transferred stock to her, 'he said he was doing the same thing to her (Dorothy). He was transferring stock to her under the same conditions that he was to me. I don't exactly remember, but I think he said he was about to transfer stock to her.' (She had already testified to statements by her father as to what should become of the stock transferred to her, on her death and on his death, similarly to the testimony of Dorothy.)

"So far as the transfer to Dorothy is concerned, it seems quite clear from the evidence that no gift was made to her of the stock in question. The requisites to establish a gift *inter vivos* (and, of course, there was here no claim or pretence of a gift *causa mortis*) are (1) a donative intent on the part of the donor; (2) an actual delivery of the subject-matter of the gift, at least to the extent practicable or possible considering the nature of the thing given; and (3) a stripping of the donor of all ownership and dominion over the subject-matter of the gift, at least to the extent practicable or possible considering the nature of the thing given. *Swayze* v. *Huntington, 82 N. J. Eq. 127* (at *p. 133*); *affirmed, 83 N. J. Eq. 335.*

"In the present case, as to 'Dorothy's stock,' we need go no further than the first of these elements. There was no donative intent, either specific or general. The inherent probability is against it, in the first place, against his giving away to a girl of fifteen or sixteen (even though one of his daughters) such a block of stock in this particular company, depriving himself (in connection with the assumed gift of six hundred shares to Elsie) of *over* half his holdings in the company. In the second place, neither his statements nor his acts indicate any such intent. He did not say to Dorothy or to Elsie that he was 'giving,' or going to give, the stock to Dorothy. He said he was going to transfer it to Dorothy, to 'turn it over to her name,' and (still more cogent) that she wouldn't have anything to do with it except it would just be in her name. And his further explanation that at her death it was to come back to him, and at his death it was to be divided equally among the four children, shows conclusively that the stock was not intended by him to be hers to do with as she pleased, but, at most, to be hers only as an agent or trustee for him. The only colorable evidence to the contrary, *i. e.*, the statement to Brown that he wanted the May 1st dividend to go to the holder, Dorothy, does not in fact militate against what I have said, because the dividends were not to go, and did not go, to Dorothy, herself, but to him, though nominally as her guardian. His actions likewise correspond (without reciting them again in detail) particularly the simultaneous taking back of an assignment from her to himself. True, if the stock were hers the assignment from a minor would be legally valueless, but it was undated, and was at least a precautionary measure good on its face after she came of age. Moreover, under all the evidence, I have no doubt whatever that at his direction the company would have acted on that assignment even before she came of age.

"Returning to the stock transferred to Elsie, there is considerably more testimony as to testator's statements than in Dorothy's case.

"Elsie, herself, says that her father talked to her in the fall of 1918, in September, she thinks; 'he said he was going to

transfer some stock to my name'; he mentioned the paper mill stock, but didn't mention the other stock; it wasn't ready at that time; he didn't do it just then. 'Two or three weeks later I went down to his office and signed some papers. I remember some paper mill stock, but I don't remember the others.' She thinks this was in December. In between there was at least one other conversation on the subject. 'He just explained to me that he was going to sign this stock over to me, that's all.' 'He asked me to make a will; I said I didn't want to at the time; he said (at just which conversation this was is not apparent) in case of his death he wanted the money to go back to the estate, or go back so we would each get an equal one-quarter, because the stock he signed over to me was more than an equal quarter.' 'In case of his death it was to be divided equally between us four children.'

"She says she signed the assignment back to her father of the paper company preferred stock (dated January 29th) about the end of January or middle of February. She signed that because 'my father asked me to make a will and I said I wouldn't; he said he would fix something for me to sign in place of a will, more or less, so that the stocks would go back to him in case I died.' This was as to all three stocks. She didn't exactly understand what the assignment was; thought it was something like a will. She thinks she signed like assignments for other stocks, because 'I signed them all together; I really wasn't paying very much attention.' Later, she says, she is not sure she signed all the assignments at one time. She didn't have any very clear idea what it was all about—just a general idea he was signing stock over to her; she did what he asked because he asked it; she doesn't recall signing the proxy to vote.

"She cannot remember whether her father told her why he was transferring the stock to her name; he said he was going to transfer stock to Dorothy under the same conditions that he was to her (Elsie). Nothing was ever said about transferring any stock or securities to the other two children or the mother. She never had anything to do with the stocks after the transfers. She thought her father was managing

it for her, though she really never stopped to think. She had no knowledge of the affairs of the companies.

"Her father told her he was opening an 'Elsie Stevens, Special' account, in which the dividends would be placed to keep them separate from her other moneys. She, herself, never drew moneys out of the 'Special account,' and she cannot remember that her father spoke to her or asked her consent about drawing moneys therefrom. She says he drew moneys from that account to pay her expenses, but in this, of course, she is mistaken; the account itself shows that nothing was drawn therefrom by him or anyone else in his lifetime, except the payment for the liquors and the installment of income tax.

"The mother testifies that her husband told her, after Elsie's recovery from the illness, that he had by his will trusteed Elsie's share of his estate; but that he was going to change that; and, again, six months later (about six months before his death), he again said he was going to change his will in that respect—Elsie was perfectly well and it was no longer fair to her. (He never did change it.) At about the same time, but whether before or after she cannot recall, he said: 'I have transferred a lump of stock to Elsie; I have such faith in her, I have transferred a lump of stock to her.'

"To William H. Gould (a close business friend and the then general manager of the paper company), the testator said, at the time of the transfer to Elsie of the paper company preferred stock (November 1st, 1918), that he was going to have his will fixed during the ensuing week; 'I want to fix things so you and Walter (Gould's son) will have the voting power of my girl's stock so long as either of you live.' 'I want to have this fixed (referring to the will); my girls understand it, but you never know what happens after a man's dead.'

"In all this search will be made in vain for testimony that testator spoke of the transfer as a gift. He spoke of it to Elsie as 'transferring it to her name'—'signing it over to her.' To the mother he said, 'I have transferred a lump of stock to her because I have such faith in her.' There is nothing but

the answer of Dorothy hereinbefore mentioned and commented upon. That is absolutely without weight because of the leading form of the question. His statements to his wife about changing the will have no bearing on the stock transfer. He was simply going to eliminate the trust for life of Elsie's share. But what he said about transferring the stock to Elsie because he had faith in her is quite significant. So, also, was his statement to Gould, by 'my girls' stock' he clearly meant the stock which would come to them directly or as *cestuis que trustent* under his will—their shares of *his* estate after his death. Under no other theory is it possible to understand his statement that he would accomplish his expressed intention by a provision in his will.

"I think it is clear from all this testimony—quite as clear as in Dorothy's case—that he had no intent to make an absolute gift of the stock to Elsie. Why should he? Why should he give away about a third of his total wealth? Why should he give it to two only of his four children, when everything else shows that he intended to treat them all alike? What reason was there to induce him to deprive himself of ownership of over half his land company stock and practically all of his paper company stock—to deprive himself of control over the two companies which were, so to speak, his own companies—he being vigorous and active and still in the prime of life? There is no reason suggested, and I can conceive of none. He intended simply to put it in Elsie's name, but himself to have the beneficial interest; he still regarded it as under his control, and so spoke and acted afterwards. I think if any disinterested person—nay, even any one of counsel for the two girls—considering all the testimony, will suppose that Elsie at the time of the transfer had said to her father: 'Do you mean that this stock is to be absolutely mine; that I am to have the right to dispose of it absolutely as I wish? Of course, under all ordinary circumstances, I would follow your requests or desires, but if any extraordinary occasion should arise, have I right to deal with it irrespective of or contrary to what you wish?' there can be no doubt that the father would have answered, 'No.'

"And his and her actions, or practically all of them, corroborate this conclusion. The non-delivery of the certificates to Elsie; the retention thereof in his safe, and of all but the preferred stock, which had no voting power, in his own file or box; the taking back of assignments and proxies; the exercise of authority over dividends; the opening of the special account for the dividends separate from the moneys which were really hers absolutely; the lack of knowledge, or even interest, by Elsie as to the whole matter; her lack of exercise or of attempt to exercise any control or authority or act of ownership as to stock or dividends; the use by him of the dividends to buy his liquors (without her authority) and for no other purpose except to pay income tax on such dividends (Elsie's other income was insufficient to be subject to tax), although he during the whole six months paid all her expenses except for clothing, just as he had before, and other acts which I need not reiterate. Some of these acts by themselves would of course not be conclusive—some would by themselves be not inconsistent with, or unexplainable from the standpoint of, the view that he had made a gift; but taken collectively they are incompatible with any such theory.

"There are three points which are urged by counsel for the 'donees' as proving a donative intent, to which allusion should be made. One is the fact that he wanted Elsie to make a will so that the stock would go back to his estate; and that for a will to be operative presupposes ownership by the prospective testatrix. To this it may be said that it by no means appears that the request as to the will was made *after* the transfers; moreover, the insistment upon a will or in lieu thereof upon a reassignment, proves that his intent was that the stock should remain subject to the final disposition that *he* desired; and, finally, a will would operate upon the bare legal title of a trustee to carry it back to the *cestui* just as efficaciously as upon a complete beneficial title.

"The second argument is that the issuance of the stock certificates by the company in the name of Elsie, at testator's instance and procurement, in itself constituted a delivery, though the certificate was retained by testator, and that *ipso*

36

*facto* the donative intent is proven, citing and quoting from *In re Roberts, 85 Pa. 84.* I have not read that opinion, but I gather from defendants' excerpts therefrom that there was no other evidence in that case as to the donor's intent to make a gift. If in this I am mistaken, then I must beg leave to differ from the conclusions therein. In the present case, as I have shown, the evidence completely controverts the idea that testator intended that the transferee should have the absolute ownership or beneficial interest in the stock. Hence, assuming there was a valid delivery, that, at most, could establish only an intent to transfer the legal title, not a *donative* intent.

"The third contention is that since testator had Elsie include the dividends from this stock in her income tax return and excluded them from his own return, he therefore must have had the donative intent as to the transfers, or, at least, then believed that he had had it at the time of the transfers; otherwise he must be convicted of deliberate tax evasion. It may be noted that there is in fact no evidence that he excluded these dividends from his own return, or in and by his return reduced his assessment from what it would have been if the stocks stood in his own name; however, I think it may fairly and reasonably be argued that he did. My own belief is that the transfers were made by him for the purpose of lightening the burden of the income tax, since I can conceive of no other reason or motive under the evidence; and that one is plausible, for the high surtaxes cut so deeply into incomes such as testator's and, for reasons which are doubtless well known and need not here be detailed, it was exceedingly difficult, except by sacrifice of capital assets, to reduce expenditures to the point correspondingly necessitated. That such a purpose, however, involved a criminal intent or moral turpitude upon the part of testator is in nowise a necessary sequence, nor do I believe it to be the fact. As I pointed out (*In re Bottomley, 92 N. J. Eq. 202*), there is nothing wrong in a desire or an attempt to do things, or to do them by methods, which do not come within the operation of the provisions of a taxing statute. The testator's mind had been

trained along legal lines; was accustomed in some degree to legal concepts and habits of thought—to legal refinements, distinctions and technicalities. I can conceive an honest belief on his part that he had made a legal gift, notwithstanding his intent and purpose was to avoid the taxing provisions and not to strip himself absolutely of all interest in the stock in favor of the daughters; and that he failed to realize that because of the latter the former failed of accomplishment. There is, too, a Scylla to companion defendants' Charybdis—for, if it be assumed that he had made an absolute and complete gift of the stock and dividends, then it was unlawful for him to take from his daughter's funds some $3,000 for his own individual purposes.

"In addition to the lack of donative intent, I am satisfied, too, that there was no valid delivery—though this, in view of the finding as to intent, is probably material only in connection with the form of the decree or the precise nature of the relief to be given. The transactions took place subsequent to the Uniform Stock Transfer act (*P. L. 1916, p. 398*), and are therefore subject to its provisions. Section 1 of that act provides that title to a stock certificate, 'and to the shares represented thereby,' can only be transferred *by delivery of the certificate* endorsed or accompanied by a written assignment or power to assign, &c. The statute does not expressly so state, but the necessary implication, of course, is that the delivery shall be made to the transferee or the transferee's agent in that behalf.

"The land company stock and the paper company common stock were all represented by certificates. Those certificates (though we may assume they were properly endorsed or assigned in writing) were not delivered to the transferees. The only delivery was to the companies themselves, and the companies were not the agents of the transferees to receive delivery for them.

"The paper company preferred stock was not represented by any certificate prior to the one issued in Elsie's name. Testator caused bonds of the company, held by or for him, to be surrendered to the company in exchange for the issue of

the preferred stock in Elsie's name, so that the transaction does not come within the provisions of the act. It might also be argued that the other transactions do not come within the spirit or intended purview of the act—that when a transfer has progressed to the point of the issue of the new certificates by the company, it has progressed past the point at which the act was directed. It may be doubted that this argument can contravene the express language of the statute, but yielding that point for the sake of the argument, it brings us to the question of whether the issuance of the new stock by the company in the name of the transferee, without delivery thereof to the transferee or her agent, can constitute a valid and sufficient delivery for a gift *inter vivos*. There are three points or steps in the transactions which might severally be conceived of as intended by the testator as acts of delivery—(1) the delivery by him to the company of the old stock certificates and assignments (the bonds in the paper company preferred stock instance) ; (2) the issuance by the company of the new stock certificates ; (3) the delivery of the new certificates by testator to Elsie and Dorothy. As to the last of these three, I think it is clear that there never was any delivery of the new certificates by testator to the 'donees'—not even of the preferred stock of the paper company to Elsie. As I had occasion recently to hold, in *Reiley* v. *Fulper, 93 N. J. Eq. 112,* where the circumstances on this point were very similar, indeed, to those here *sub judice*—if the placing of the certificates in the safe was intended to constitute delivery, it was legally insufficient so to do. But, in my view of the testator's mental processes, he did not intend that step as the act of delivery—certainly not in the case of the certificates of common stock, for it would be practically impossible for his mind to conceive of placing the certificates in his own file as constituting a delivery. Yet since he conceived (as in my view he did) that he had accomplished the transfer, he must have looked upon some other act as the delivery. It is improbable that it was the first of the three steps above mentioned— especially in the instance of the paper company preferred stock, for there was no transfer, or pretence thereof (at least,

the recital in the minutes of the company was nothing more than a pretence or fiction), of the bonds to Elsie. They were surrendered by testator to the company. And, as to the other three transfers, his actions and statements to Mr. Brown on the transfer to Dorothy, indicate that he thought the transfer would be incomplete until the actual issuance of the new stock in her name.

"I think, then, that he intended the issuance of the new certificates as the act of delivery. I think that such issuance, even in the name of the intended transferee, unless and until completed by delivery to such transferee or her agent, was insufficient to constitute a valid delivery. Stock holding has a dual aspect. On the one hand, it involves a contractual relationship between corporate entity and the stockholder, and on the other, it involves the ownership of property—of an interest in the corporate property. Considering the contractual aspect, the dissolution of the contractual relationship between the corporation and the old stockholder is conditioned upon, and is incomplete until, the perfection or completion of the contractual relationship between the corporation and the new stockholder (the transferee), and that is not complete (at any rate, in a case where the transferee has not received from the transferor the assignment of the shares and himself presented it to the company) until the delivery of the new certificate and its acceptance by the transferee. No one can become a stockholder in a company without his knowledge and consent. *Great Council, &c.,* v. *Mohican Tribe, &c., 92 N. J. Eq. 593.* Obviously, then, until that time, the transferee does not become the owner of the interest in the company's property, which ownership is the other attribute of his character of stockholder, and until that time the transfer of that interest in that property is incomplete. Considering the matter from the property aspect—the transfer of the stockholder's ownership of property or interest in corporate assets —the transaction is one solely between transferor and transferee. The corporation has no interest in the thing from this standpoint—it is an outside party entirely. Either before or since the act of 1916, hereinbefore referred to, the change of

ownership is complete upon the delivery by the transferor to the transferee of the certificates duly assigned. *Matthews* v. *Hoagland, 48 N. J. Eq. 455, 486 et seq.* Thereafter the corporation is a mere agent, so to speak, of the transferee, to perfect his legal title, supply him with the evidence thereof and perfect his relationship to and with the other stockholders. Conversely, as it seems to me, where the transferor delivers nothing to the transferee, but delivers the certificate and assignment to the company, the latter is simply the agent of the transferor to accomplish the delivery to the transferee. That is not done until the delivery of the new certificate to the transferee (although it might conceivably be done by delivering the old certificate and assignment to him). Until that is done the change of ownership is not complete; until it is done there is no relationship between the corporation and the transferee; and until it is done the transferor can, at least in the case of a gift, stop the agent's action in the matter just as well as he could stop his own hand half-extended toward a manual delivery of a gift of a watch or a dollar bill. It is not done when the new certificate is delivered by the corporation, not to the transferee but back to the transferor. Until the delivery of the new certificate to the transferee, the transferor has not stripped himself completely of dominion and control—nor as nearly completely as possible under the circumstances and nature of the thing given. His retention of possession of and control over the new certificate deprives the transferee of complete dominion and control. The latter could not sell or transfer the stock to anyone else, even though he might vote and receive dividends thereon. Hence, even though so intended, it is not a legally valid and sufficient act of delivery. I think, perhaps, it is somewhat clearer if looked at from another angle. Suppose testator after receiving the new certificate from the company had changed his mind and decided that he wanted the stock for himself; that Elsie had demanded the certificate from him and he refused to give it to her. There is no doubt in my mind that Elsie's claim of ownership, in whatever court or by whatever form of action asserted, would not be sustained.

"There was of course no delivery in the present case to the transferee's· agent; assuming that testator might validly act in such capacity, he had not here been constituted such agent by the transferee.

"The question of the legal sufficiency, as an act of delivery, of the issuance by the company of a new stock certificate without delivery thereof to the transferee, seems never to have been decided heretofore in this state; but I think the conclusion as to its insufficiency in that behalf necessarily flows from the application to the facts of the well-established principles of the law of gifts *inter vivos*. It is of course in conflict with the decision in *In re Roberts, 85 Pa. 84.* It is not, however, in conflict with such cases as *East Rutherford Building and Loan Association* v. *McKenzie, 87 N. J. Eq. 375; New Jersey, &c., Trust Co.* v. *Archibald, 91 N. J. Eq. 82; Kauffman* v. *Edwards, 92 N. J. Eq. 554,* where the thing given is not the whole of the asset owned by donor, but only a partial interest therein, and the delivery is of the kind of which the nature of the thing given is susceptible.

"Defendants argue that it would be absurd to require an actual delivery to Elsie and a redelivery by her, if she intended and desired her father to manage the stock for her as her agent. Doubtless, all positive rules do or may seem absurd in exceptional cases, but it must be remembered that such rules rest upon reasons of public policy, for the general good, to which the inconvenience of the few must yield. I think it cannot be questioned that the rule requiring a delivery exists, that a gift can never be made by words alone, and that it exists just as definitely and absolutely in a court of equity as in a court of law. There is no reason for equity to aid a donee—a volunteer—in the establishment of a gift (although if the gift be once established, a donee is as much entitled to the aid of equity in the protection of his ownership as an owner who has become such by any other means).

"It results from what I have said, that testator was at his death the owner of the four blocks of stock in question, and of the indebtedness (representing the dividends on this stock prior to his death) standing on the books of the land com-

pany in the name of 'Elsie Stevens, Jr., Special,' and 'Dorothy Stevens, Richard Stevens, Guardian,' and to such ownership his executors succeeded. The latter are entitled (upon their surrender of the outstanding certificates now in their possession) to new certificates of stock in their own names from the two companies (who are parties to the suits); and to the unpaid dividends on the stock since testator's death (which have been held in abeyance during the litigation); and to the return of such moneys as have been paid since testator's death to or for Elsie and Dorothy out of the aforesaid dividend accounts.

"I think the case is one where no costs should be awarded."

*Mr. Robert H. McCarter (Mr. Maximilian T. Rosenberg and Mr. Theodosius Stevens, of the New York bar, on the brief), for the appellants.*

*Mr. Josiah Stryker, for the respondents.*

PER CURIAM.

The bills were filed to obtain an adjudication of the ownership of, and title to, certain shares of corporate stock owned by Richard Stevens, deceased, in his lifetime, and claimed by the executors of his will, but which were also claimed, partly by his daughter Elizabeth C. Stevens, Jr., who died pending the litigation, and partly by his daughter Dorothy P. Stevens. Each daughter claimed by virtue of an alleged gift *inter vivos* from her father, and the fundamental question argued before the vice-chancellor was whether there had been in fact and law such a gift. He held to the contrary in a careful and lengthy opinion in which all the facts (for the most. part, if not altogether, conceded) were fully discussed, and the law applicable thereto stated. The result he reached in both cases was—first, that there was an absence of donative intent, and secondly, that even if such intent had existed, the evidence failed to show a completed gift under the well-established rules of law governing such cases.

We think it sufficient to say that after full argument and due consideration of the matters involved, we concur with the views of the learned vice-chancellor on which he based the conclusion that there was no completed gift, and, of course, in that conclusion and for those reasons the decrees before us will be affirmed. In view of this result, the question of donative intent needs no discussion.

No. 73—

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TREN-CHARD, PARKER, BERGEN, KALISCH, BLACK, KATZENBACH, WHITE, GARDNER, ACKERSON, VAN BUSKIRK—12.

*For reversal*—None.

No. 74—

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TREN-CHARD, PARKER, BERGEN, KALISCH, BLACK, KATZENBACH, WHITE, GARDNER, ACKERSON, VAN BUSKIRK—12.

*For reversal*—None.