STATE OF MINNESOTA, *ex rel.* St. Paul & Duluth Railroad Company, *vs.* AUSTIN H. YOUNG.

July 14, 1890.

Appeal from Order with Supersedeas—Attempted Enforcement of Order—Remedy.—When an order is made in a cause or proceeding of which the court has jurisdiction, an appeal from the order, with a stay of proceedings on it, does not go to the jurisdiction of the court to enforce the order by proceeding against the party disobeying for contempt. The party's remedy to try the rightfulness of the court so proceeding is not by prohibition, but by appeal, if convicted.

Insolvency — Jurisdiction of Court over Property Terminated by Agreement of Parties, Conveyance to Trustee, and Discharge of Assignee.—All the parties to an insolvency proceeding, the debtors and all the creditors, and the assignee in insolvency, who was ordered by the court to execute the deed, and the trustee selected by the debtors and creditors, joined in a deed by which the assignee conveyed the property of the insolvents to the trustee, in trust to apply it to such uses as the assignee could not, as such, apply it to, and such as the court could not au-

thorize him to apply it to, to wit, to carry on a business with it indefinitely, and distribute the profits among the creditors, and by the terms of which deed the creditors released the debtors from all claims in consideration of their joining in the deed, and the same was declared to be a compromise between the creditors and debtors. The deed having been executed, the court discharged the assignee. *Held,* that the insolvency proceedings were thereby terminated, and the property thereby passed beyond the jurisdiction and control of the court; that the trust and the doings of the trustee were not a proceeding in court, and the court could get jurisdiction to control or protect the trustee only by means of an action brought.

Writ of prohibition, directed to respondent as judge of the district court for Hennepin county.

*W. H. Bliss* and *Jackson & Atwater,* for relator.

*W. E. Hale,* for respondent.

GILFILLAN, C. J. March 27, 1883, the railroad company, relator, executed to the firm of Bliss & Elliott a contract to convey to them 20,390.84 acres of land in the county of Carlton for the price of $153,147.63, secured by the notes of the firm, the last of which was to become due May 1, 1892. The contract contained conditions in respect to cutting and sawing into lumber the timber standing on the land, which gave it its chief value. Upon compliance with the terms. of the contract, and payment of the purchase price, the vendor agreed to convey the land; but in case of default the vendor was to have the right, at its election, to declare the contract void. August 14, 1884, Bliss & Elliott, having become insolvent, made a general assignment, under the laws of the state, of their property, for the benefit of all their creditors, to one Dodge. The assignment was filed in the district court in Hennepin county; and, Dodge having failed to qualify, the court appointed as assignee or receiver, in his stead, one Lyman, who accepted and qualified, and administered in part the insolvent estate. At this time, as appears, the railroad company claimed the right, by reason of defaults on the part of the vendees, to declare the contract to convey the real estate void. After some negotiation, all the parties interested—the assignors in the assignment, the assignee Lyman, the trustee named, and all the creditors who had filed their claims, and the railroad company, which had not filed any claim—

joined in a deed by which, in terms, the assignee conveyed to Paul Blackmar, as trustee, all the property of the insolvents, including the contract to convey. By the terms of the deed, which are stated with great precision and at great length, the trustee was to take immediate possession of, and operate continuously, the mill erected by Bliss & Elliott, according to the provisions of the contract to convey; to sell all lumber, lath, and shingles then manufactured at the mill, and out of the proceeds pay all liens for labor, and pay the railroad company at the rate of $2.33 per 1,000 feet on all logs hitherto cut under the contract, and divide the residue, after paying necessary expenses, *pro rata* among the creditors other than the railroad company and A. F. Elliott; and to manufacture all logs then on hand, and those cut which could be advantageously driven that fall; and should thereafter continue to carry on the business of cutting and driving logs, and manufacturing and selling lumber therefrom, under the provisions of the contract to convey, paying the railroad company at the rate of $2.33 per 1,000 feet upon all logs which shall have been manufactured, in lieu of the payments specified in said contract to convey, and distribute the residue of the proceeds of sales *pro rata* among the creditors other than the railroad company and A. F. Elliott; to keep the mill in good repair, and continue and carry on said logging business, with all reasonable diligence, until all the lumber included in said contract to convey shall be manufactured and sold, and the proceeds applied, or until the claims of all creditors of Bliss & Elliott other than the railroad company and A. F. Elliott are satisfied; but if they shall not be satisfied within five years from October 11, 1884, or if, at any time after three years from that date, it shall be unprofitable to carry on said business, then the trustee may, if he deem it advisable, and a majority of the creditors assent thereto in writing, proceed to close out the property and assets in business by a public sale of all the right, title, and interest of Bliss & Elliott therein. Then follow directions as to how, and upon what notice, the sale may be made, and for the application of the proceeds, and that the sale shall be made subject to the contract with the railroad company, and to all its rights thereunder. Upon the termination of the trust by payment of the creditors, from proceeds of the business or other-

wise, the trustee was to reconvey the mill and property in his possession to Bliss & Elliott, to have and to hold it under the original contract to convey. The deed named a committee of three on behalf of the creditors, by and with whose advice and assistance the trustee might act in conducting the business. The deed contained this clause: "And the said Bliss & Elliott shall, upon the execution and delivery of this instrument by them, have, and such execution and delivery shall operate as, a full and complete discharge of them and each of them from each and every the obligations and claims of their creditors and each of them who are parties hereto; this instrument, as between said creditors and said Bliss & Elliott, being intended and to be held as a deed of compromise, whereby, in consideration of the conveyance by them of all their said property to said trustee upon the trust aforesaid, they, said creditors and each of them, covenant and agree to release and discharge them from all claims and liabilities, and will upon request execute all further proper releases and discharges from each thereof." Although we have not referred to all the provisions of this deed, we have stated them with sufficient fulness to show how far the powers and duties of the trustee are from those of an assignee or receiver in insolvency proceedings. There is nothing in it to indicate that the trust was to be regarded as a continuation of those proceedings, or that the court was to have any supervision of the acts and doings of the trustee other than a court of equity may have over any trust.

On December 3, 1884, Lyman, the assignee in insolvency, presented to the court a petition, accompanied with a copy of said trust-deed, stating that it had been agreed on by all the parties, and stating that in his opinion it would be for the best interests of all parties that the insolvent estate should be administered under some form of voluntary trust, and presented also a communication from the railroad company, consenting that a trustee be appointed by the court to take and administer said trust. Upon a hearing had, and the consent of the parties interested, the court ordered the assignee to execute the deed; and, he and the other parties having executed it, the court allowed his accounts and discharged him. The trustee entered upon the discharge of the trust, and has ever since continued in it. In

March, 1890, the railroad company commenced, in the district court in
Carlton county, an action against the trustee, alleging in its complaint,
among other things, that the trustee has not accounted for all the
logs cut by him, manufactured, and sold, but, on the contrary, has
failed so to do; that he has failed to pay the company $2.33 per
1,000 feet upon the timber so cut, and is in default to plaintiff in the
payments provided for in the trust-deed in more than $75,000; and
that he has been cutting the timber in a wasteful manner,—and ask-
ing as relief, among other, that he render an account of his doings
as trustee, and plaintiff have judgment against the trustee for the
amount found due it, and that the contract to convey be adjudged
forfeited.   Thereupon the trustee applied to the respondent, a judge
of the district court in Hennepin county, and obtained an order re-
quiring the company to show cause before him why it should not be
restrained from prosecuting the action so commenced.   At the time
mentioned in the order, the company appeared, and objected to the
jurisdiction of the court.   But the restraining order was issued.   The
company appealed from that order to this court, and executed on such
appeal the bond required by the statute for a stay of proceedings up-
on the order, in a sum and with sureties approved by respondent.
After that the company caused judgment in said action to be entered
in its favor by default, and the trustee procured from the respondent
an order requiring the railroad company, its vice-president, and its
attorneys in said action brought by it, to show cause why they should
not be judged guilty of contempt of court in causing said judgment
to be entered.   Thereupon the parties to whom said order was directed
sued out the writ of prohibition from this court, which brings the
matter before us.

The relators seek to sustain the writ on two grounds: *First*, the
respondent, or the district court in Hennepin county, had no juris-
diction to entertain the application for the restraining order, nor to
issue said order, nor of the proceedings to try the parties for the al-
leged contempt; *second*, by the appeal from the restraining order
with the stay-bond, the effect of the order was suspended pending the
appeal, and the court in Hennepin county was ousted of further ju-
risdiction.

Where an action or proceeding is pending in a court which has full jurisdiction over it, that jurisdiction covers all orders that are proper to be made in the action, and includes the power to try parties charged with contempt for disobedience of such orders. If the order disobeyed had been appealed from, and proceedings on it stayed, it might be error in the court to adjudge the party guilty of contempt in doing what the order forbade; but the appeal and stay would not go to the jurisdiction of the court to try the question of contempt. As the writ of prohibition issues only to keep courts within their proper jurisdiction, it would not lie, in such a case, to prevent the court trying the charge of contempt. The party's remedy, if convicted, is by appeal. So that the appeal from the restraining order, and the stay, and their effect on the right of the plaintiff in the action in Carlton county to proceed in that action, are not to be considered on this application.

In the case of trusts created by contract, the jurisdiction of the court to enforce the duties of the trustees, and protect the interests of the *cestuis que trustent*, is acquired only by proceeding in a civil action. Such a trust is not a proceeding in court. It is not within the jurisdiction until the parties are brought into court by process such as the statutes provide in civil actions. This is not disputed. But it is claimed, in effect, that by the filing of the assignment, and the appointment by the court of Lyman as assignee, the estate of the insolvent debtors was brought within the jurisdiction and under the control of the court, and that the assignee had no power to convey the property to the trustee except by order of the court, and the trustee derives his title through the action of the court, and therefore the trustee holds the property, as the assignee did, as the officer of the court, and he is subject to the same control of, and entitled to the same protection from, the court as the assignee, had the conveyance to the trustee not been made. Which amounts to about this: That the creation of the trust was part of the proceedings in insolvency, and that the trust, and the holding of the title by the trustee for the purpose of it, and whatever he may do in execution of it, are a continuation of those proceedings. If not a contin-

uation, then the court's jurisdiction over the matter ceased when the conveyance was made, and the assignee discharged; for there is no power in an insolvent court to substitute some other proceeding in the place of the insolvency proceeding. The function of the court in insolvency proceedings is to appropriate the property of the debtor to the payment of his debts in the manner pointed out by the statute, and for that purpose to cause his property to be sold and turned into money in the way most for the interests of all concerned. It may be that, in order to effect the best sale, the court would have authority to direct other things to be done,—as, in case of a merchant's stock, it might appear necessary, in order to make a good sale, that additions to the stock be made. We will not decide that in such case it would not be proper to direct the assignee to make the necessary replenishment with the funds in his hands. But certainly the court would have no power to carry on, or direct its assignee or receiver to carry on, indefinitely, a business, for the purpose of making profits with which to pay the debts. The purpose of this trust-deed is to carry on a business in order to make profits to satisfy the claims of the creditors joining in it. By its terms the business is to be carried on for three years at least, and may be carried on, if the claims of such creditors are not sooner satisfied, for more than five years; and no payments are to be made on such claims (after applying to them what, after certain deductions, will remain of the proceeds from sales of lumber, lath, and shingles manufactured at the time of executing the deed) except from the profits of the business. It is hardly conceivable that an insolvent court could determine that, in administering the laws regulating insolvency proceedings, the assignee or receiver might be directed to carry on such a business. It certainly does not appear that, in directing the assignee to convey to the trustee, the court entertained any such idea; or any other than that it was surrendering the property to the parties, to be held, used, and disposed of as they had agreed upon. As soon as the conveyance was made, the insolvency proceedings were settled, so far as the parties could settle them, as fully as though the debtors, or some one in their behalf, had paid all the creditors par-

ties to the proceedings. By the terms of the deed, its execution operated as a release of the debtors from all claims of the creditors joining in it. After that, the creditors could look only to the administration of the trust which they and the debtors had created by the deed. Though the trustee was not, in the popular sense, a purchaser, he was so in the legal sense; for the creditors, by releasing the debtors, had purchased the property, so far as was necessary for the execution of the trust.

The respondent, in his memorandum of decision, lays much stress upon the proposition that the title to the property was in the court, and that the trustee must derive his title through the assignee's deed made by direction of the court, from which it seems to be inferred that he holds the title for the court, and as its officer. Such would, undoubtedly, be the case, had the assignee been directed to convey to another as successor to his powers and duties, whether designated "assignee," "receiver," or "trustee;" for by such a conveyance the court would not let go its hold upon the property. But such would not be the case with a conveyance by direction of the court to a purchaser, though he, also, would derive his title through the order of the court. No question can be made of the authority of the insolvent court, with the consent of all the parties interested, to restore the property to the debtor, or to direct it to be conveyed to the creditors in satisfaction of their debts, or to be conveyed to them, or to any one agreed upon by all the parties, to be disposed of, and the proceeds applied upon the debts. In other words, the court may permit the parties to compromise on such terms as they may agree upon. That was all that was done in the insolvency proceedings of Bliss & Elliott. The parties compromised by agreeing that, in discharge of the debts, the property should be transferred to a trustee of their choice, with powers and duties agreed on by them such as do not pertain to an assignee or receiver in insolvency, and such as the court could not vest in nor impose upon him; and to this the court, by its order, consented. And, thus having surrendered the property to the parties, there were not only no debts for it to see paid, but no property for it to administer under the insolvent law. It thereupon dis-

charged the assignee, and that was the end of the insolvency proceedings. The respondent had no jurisdiction to issue the restraining order, nor in any matter based on it.

Let the writ of prohibition absolute issue.