## White v. White.

(Decided May 24, 1929.)

A. F. BYRD, A. N. CISCO and LESLIE W. MORRIS for appellant.

MARTIN & SMITH for appellee.

OPINION OF THE COURT BY DRURY, COMMISSIONER—
Affirming in part and reversing in part.

We shall refer to the appellant as the defendant, because that is the position he occupied in the trial court, and to his son, the appellee, T. R. White, we shall refer as the plaintiff. The trial court by its judgment made six findings:

> (a) That the defendant owed the plaintiff $2,-500 for a one-half interest in a drilling rig and set of tools.
> (b) That the defendant owed plaintiff $3,300 with interest from July 28, 1922, upon a note.
> (c) That plaintiff and defendant were not partners in the oil and gas business.
> (d) That they were not partners in the Arnett land or leases.
> (e) That plaintiff is not entitled to share in the profits from the operation of the Arnett land or leases.
> (f) The plaintiff is not entitled to share in the profits arising from the operation of the drilling outfit.

All six of these findings are before us for review.

Findings (a) and (b), which were favorable to the plaintiff, have been brought here by appeal prosecuted by the defendant, and findings (c), (d), (e), and (f), which were favorable to the defendant, have been brought here by a cross-appeal prosecuted by the plaintiff.

## THE FACTS.

John G. White, Sr., has for some years been engaged in drilling and prospecting for oil and the promotion of oil drilling and prospecting companies. On April 6, 1921, his brother, Bev. White, was shot and killed by one John Bailey. See Bailey v. Com., 193 Ky. 687, 237 S. W. 415. The defendant, who at the time resided at Ashland, upon the death of his brother, Bev. White, left his employment to a great extent and devoted almost the whole of his time toward assisting in the prosecution of the man who had killed his brother, attending all of the trials of the accused and taking an active part in the prosecution, which resulted in the conviction of the accused, whose punishment was fixed at life imprisonment in the penitentiary. At the time of the death of Bev. White, brother

of the defendant, the defendant, had a son, John G. White, Jr., who was at that time living in Chicago, Ill. Upon obtaining information of the murder of his uncle, John G. White, Jr., wired his father, the defendant, for funds sufficient to enable him to come to the assistance of his people. Upon receipt of his wire the defendant complied with his request, wiring to him the money desired. Upon receipt of the money John G. White, Jr., came to Kentucky. Upon his arrival he joined with his father, the defendant, in assisting in the prosecution of the murderer of his uncle, Bev. White, accompanying his father to all of the trials of the accused and assisting his father, the defendant, in every manner possible. The feeling between the White and Bailey families was bad. Trouble between them was ever immient. It was thought that the defendant would be killed. In fact, he thought so himself. It appears that at that time the defendant was a man some 60 years of age. He was the father of a large family, which consisted of his wife, who at the time was suffering from tuberculosis, and nine children, four of whom were infants of tender years. His whole estate consisted of $75,000 worth of the capital stock of the Boyd Oil & Gas Company, a corporation, and a one-half interest in a string of oil drilling tools.

The defendant was greatly interested in the success of the Boyd Oil & Gas Company. He had organized it. The whole of his estate was invested in its capital stock. Since its organization, he, being its vice president and general manager, had devoted the whole of his time and labors towards its interests. While it was the owner of valuable assets, consisting of gas and oil land and leases, yet it was at this time in only fair financial condition. Its capital stock was of only little value, if any. Its future success, as well as the future value of its capital stock, depended upon its continuance until operating conditions became better and more profitable. These facts the defendant well knew. The capital stock owned by the defendant appeared upon the books of the corporation in his name. In the event of his death, in the settlement of his estate, it would have been necessary to have sold this $75,000 worth of capital stock owned by him. It would have brought nothing. Thus, the family of the defendant would have been left penniless. These facts the defendant also realized. So, in anticipation of death, in an effort to avoid such a situation, so he says, the defendant took the whole of his stock in the Boyd Oil &

Gas Company to its secretary and treasurer, Mr. Benjamin H. Saunders, and had it transferred and assigned to his son, John G. White, Jr. It appears that his son, John G. White, Jr., had no knowledge or information of this assignment of the stock to him until some time afterwards, when the defendant advised him of it. It is clearly shown by the evidence that the defendant in making this transfer and assignment of the stock to his son, John G. White, Jr., did not intend to divest himself of his interest therein or to relinquish the control and ownership of it, but only assigned and transferred this stock to his son, John G. White, Jr., to enable his family, in the event of his death, to hold the stock until it could be sold for its reasonable value. It was only for the protection of his family that the transfer and assignment were made. This fact is clearly shown by the record. The defendant did not ever deliver this stock to his son, after it had been assigned and transferred by him, but kept the whole of it in his safe and in his own possession. In fact, that such were the conditions and purposes of the transfer and assignment of the stock to John G. White, Jr., is not questioned by the plaintiff. Clearly, under the facts and circumstances shown by the record, John G. White, Jr., held the legal title to this stock only as trustee for his father, the defendant. All of the parties interested considered this to be true. After the transfer and assignment of the stock, the defendant continued to act as vice-president and general manager; he voted the whole of this stock at all stockholders' meetings, and all parties, including the stockholders of the Boyd Oil & Gas Company, considered him as the owner of this stock.

We have stated that the defendant also owned a one-half interest in an oil drilling outfit. At the time of the transfer of the stock in the Boyd Oil & Gas Company to his son, John G. White, Jr., the defendant also transferred and assigned to his son his one-half interest in the oil drilling outfit, executing to him the following writing:

"$2,000.00                                    4/22/21.

"Received of John G. White, Jr., Two Thousand Dollars. Cash in hand paid for my one-half interest in full of set or Drilling Tools and Boiler and Engine and all other Tools owned by myself and Kelly and Clarence Williams now on the Lore Lease on Mine Fork in Magoffin County, Ky.

"(Signed) John G. White."

It is admitted by the record that the transfer and assignment of the oil drilling outfit was at the same time and upon the same conditions as was the transfer and assignment of the stock in the Boyd Oil & Gas Company. Although it is recited in the writing that the defendant received in consideration of this transfer the sum of $2,-000, yet it is admitted that he did not receive one cent as consideration for the transfer. This receipt the defendant testifies was never delivered by him to his son, John G. White, Jr., but it, as well as the stock assigned to him, was placed by the defendant in a drawer of his desk and there remained.

Since John G. White, Jr., was accompanying his father to the trials and assisting in the prosecution of John Bailey, it was feared, as was later true, that he, as well as his father, would be killed by the Baileys. So, in view of this situation, the defendant again went to the secretary and treasurer of the Boyd Oil & Gas Company, Mr. Benjamin H. Saunders, taking with him this stock which had been theretofore assigned to John G. White, Jr., by him, and had this stock reassigned and transferred to the plaintiff, T. R. White, who at that time had just reached his majority, under the same stipulations and conditions as it had been assigned and transferred to his son, John G. White, Jr. This stock, after its re-issue in the name of the plaintiff, was again turned over to the defendant, and was again placed by him in his safe, where it remained. The plaintiff did not know of the action of his father in having this stock transferred to him and reissued in his name until long after the transfer was made. In his testimony, he admits that he never had possession of this stock and that he never saw it, but that it was during the whole of the time in the possession of the defendant. In fact, at the time of this transfer of the stock to him, he was not at home, but was in West Virginia working in a coal mine, and did not return home for nearly a year thereafter.

As had been expected and anticipated, on the 25th of February, 1922, John G. White, Jr., was shot and killed by an unknown assassin. John G. White, Jr., left a will by which he devised his property to the plaintiff, T. R. White. T. R. White, under this will, claims to have acquired the stock in the Boyd Oil & Gas Company, which had been owned by the defendant, John G. White, Sr., for which he had surrendered the certificates and had new certificates issued to John G. White, Jr., but which

had never been delivered, although they stood on the books of the company in the name of John G. White, Jr., and which new certificates had been during the lifetime of John G. White, Jr., again surrendered and new certificates therefor written in the name of T. R. White; but these had never been delivered, and were still under the control of John G. White, Sr. Since they had not been delivered, title to them had not passed. See Kelley-Koett Mfg. Co. v. Goldenberg, 207 Ky. 695, 270 S. W. 15.

Since John G. White, Jr., had assisted his father in the oil business from the time he came here from Chicago, in April, 1921, until he was assassinated, it is well to state that in this period, of less than ten months, his father paid him over $1,900, and in view of the fact that this young man knew nothing whatever of the business, we do not hesitate to hold that this was all that his services were worth. It appears from the record that upon the death of John G. White, Jr., the plaintiff took his place and assumed toward his father, the defendant, the exact relationship which his deceased brother, John G. White, Jr., had occupied, accompanying his father and assisting him in such manner as he was able. For these services the plaintiff received due compensation. No partnership existed between them at this time. This fact the plaintiff admits to be true. Nor does he base his claim of the existence of the alleged partnership as having grown out of this relationship, but his claim of the existence of the alleged partnership is, as we shall hereinafter show, based upon express contracts alleged to have been entered into between the parties subsequent to the time of these services. This the defendant denies.

The defendant continued in the active performance of his duties of general manager of the Boyd Oil & Gas Company until April 11, 1922. During all of this time, he was, under the conditions above outlined, assisted by his son, the plaintiff, in the performance of these duties. On April 11, 1922, the defendant, because of a disagreement among the stockholders, resigned as general manager and vice president of the Boyd Oil & Gas Company. Upon his resignation as vice president and general manager, it was agreed between him and the directors of the company that the Boyd Oil & Gas Company would take over his holdings in it, which at that time consisted of the $75,000 worth of its capital stock which had been assigned to the plaintiff and an indebtedness of it to him in the sum of $11,000 for money advanced by him to it. A

settlement of accounts was finally agreed upon by the parties, whereby the Boyd Oil & Gas Company, in consideration of the return to it of the stock owned by the defendant, agreed to deed to him the three tracts of land known in this record as tracts Nos. "A," "B," and "C" or the Arnett lands, and executed to the defendant its note in the sum of $6,000, which sum was reached in compromise of the claim of the defendant for money advanced. After the settlement was reached, the defendant requested that the deed to the Arnett lands be made to the plaintiff. This the Boyd Oil & Gas Company did. Upon the execution of the deed to the plaintiff, it was delivered to the defendant, who kept the same in his possession from the date of its execution until about May 1, 1922, at which time he turned it over to the plaintiff with directions that he take it to Magoffin county and have it recorded. After the deed was recorded, the plaintiff returned it to his father, and it remained in the possession of the defendant from that time until just a few days before this suit was brought, at which time the plaintiff, without the consent of the defendant, obtained possession of the same from the office of the defendant in his absence.

We feel that we have said enough to give a general idea of the situation, and we shall now discuss and dispose of the findings of the trial court, beginning with the cross-appeal.

Was there a partnership between these men?

We cannot determine this entirely by their evidence, as they fail as completely to agree on the facts as they do to agree on their rights. In fact, we suspect their failure to agree on their rights is largely due to failure to agree on facts, and possibly their testimony about the facts may be colored by what they conceive to be their rights in the premises. However, we are not assisted much by what either may say for himself, and we will have to rest our finding very largely on admissions against their interests made by these men, and such evidence of outsiders as the record affords. We must find some evidence of this partnership, else we must hold it does not exist. The suggestion is made that this partnership was first formed between the defendant and his son, John G. White, Jr., and that the real purpose of the paper copied above was to show that. That position is untenable, for if that paper formed any partnership, it formed one between John G. White, Jr., and Kelly and

Clarence Williams, with the defendant in no wise interested therein, because the defendant only owned a onehalf interest in that rig. The paper copied shows that, and if he parted with that, then he parted with all he had. It is argued that the bank account was kept in the name of John G. White & Sons, and that defendant had and used stationery bearing that name and on which there appeared the names, John G. White, Theodore R. White, Henry G. White. If this can be regarded as sufficient to show the existence of a partnership between John G. White and T. R. White, there is equal reason for including Henry G. White, who was then a boy only 12 years of age, and all agree that he was not a partner. It seems the defendant wrote a letter or two in which he used the expression, "our property," but that has little effect on us, for we have known many fathers and heads of families, in referring to property absolutely and individually their own, to use such expressions as, "our house," "our farm," "our corn," "our cattle," "our hogs," "our automobile," etc. On the other hand, we find in this record an income tax return made out in the name of the defendant and admitted to be in the handwriting of the plaintiff. It covered the year 1922, and is made out in the name of John G. White. We are unable to understand why the defendant, who had vast experience, should, as the plaintiff says he did, give the plaintiff, a young inexperienced boy, a half interest not only in his business, but in his property as well. The trial court found against the plaintiff on the question of partnership, and we not only are not convinced that the trial court erred, but, on the contrary, have reached the same conclusion, and regard the findings (c), (d), (e), and (f) as correct. Therefore, the judgment is affirmed upon the cross-appeal.

This brings us to finding (a), which was that the defendant owed the plaintiff $2,500 for a one-half interest in a certain drilling rig which it is admitted the defendant converted to his own use. That finding is based upon the $2,000 receipt copied above. The defendant testified that receipt was never delivered, but as his son, John G. White, Jr., was dead when this testimony was given, the exceptions of plaintiff to this evidence were properly sustained, as the defendant was not a competent witness. See Combs v. Roark, 221 Ky. 679, 299 S. W. 576; Id., 206 Ky. 454, 267 S. W. 210. Miss Alice White testified her brother, John G. White, Jr., gave her

674

this receipt, and she kept it for him. In Taylor v. Purdy, 151 Ky. 82, 151 S. W. 45, a similar situation was before this court and in that opinion it is said: "The deed appearing in the possession of the trustee, a presumption of its delivery will be indulged on behalf of the infant beneficiaries. The delivery having thus been shown, the deed operated as a gift inter vivos." It takes less evidence to establish the delivery of a contract than it does to establish the delivery of a gift inter vivos; therefore the delivery of this instrument was established. The finding of the chancellor as to the value of this one-half interest is supported by the evidence, and that part of the judgment is affirmed.

Upon finding (b) the evidence shows the plaintiff did not let his father have $4,000, for which the defendant gave his note, but did let him have $3,333.33. Plaintiff checked out much of this, let him have some of that again, and later checked out much of that, so that the state of accounts between these men is in great confusion, and the record relative thereto is very unsatisfactory; therefore the court's finding (b) is reversed, with directions to submit these accounts to a commissioner, who will hear such proof as the parties can and may desire to offer, after which the commissioner will report his finding to the court. When that is done, the court will then determine this feature of the case.

On cross-appeal, the judgment is affirmed; on original appeal, it is affirmed in part and reversed in part.