249 Minn. 36 (1957)
81 N.W. (2d) 615
82 N.W. (2d) 221
IN RE DECLARATION OF TRUST MADE BY ARCHIBALD G. BUSH.
ARCHIBALD G. BUSH
v.
JOSEPH B. CROWTHER.
ELLEN FRANCES BASSLER, SPECIAL ADMINISTRATRIX OF ESTATE OF WILLIAM B. BASSLER.
Nos. 36,875, 36,917, 36,923.
Supreme Court of Minnesota.
February 15, 1957.
*38 Oppenheimer, Hodgson, Brown, Baer & Wolff and Kenneth W. Green, for appellant-respondent Crowther.
Sullivan, Stringer, Donnelly & Sharood, David R. Roberts, and Philip Stringer, for respondent-appellant Bush.
Randall, Smith & Blomquist and Perry M. Wilson, Jr., for respondent-appellant Ellen Frances Bassler.
MATSON, JUDGE.
In an express trust proceeding, we have three separate appeals, one appeal by the objector from two separate orders whereby the court by one order confirmed the appointment of the trustee and assumed jurisdiction of the trust pursuant to M.S.A. 501.33, and by a second order allowed the trustee's account and discharged him; and then two other and separate appeals, one by the settlor-trustee *39 and the other by a special administratrix, from a subsequent order which, subject to a 30-day stay, vacated the above orders. All appeals, heard jointly by this court, except the one by the special administratrix, were taken prior to the expiration of the 30-day stay applicable to the vacating order last above mentioned.
The appeal from the first two orders confirming the trust and allowing the trustee's account was taken by Joseph B. Crowther, as objector, in his capacity as administrator of the estate of Audrey Arnold Johnson, deceased beneficiary, by virtue of letters of administration issued to him in the State of Kansas. The appeals from the vacating or final order were taken by Archibald G. Bush, the alleged settlor-trustee, and by Ellen F. Bassler, special administratrix of the estate of William B. Bassler, father and heir of Audrey Arnold Johnson.
The appeal by the objector from the order confirming the appointment of a trustee and from the order allowing the trustee's account and discharging him raises issues (1) as to whether an express trust of corporate stock was ever created over which the court could acquire jurisdiction and (2) if a trust was created, whether the court was divested of its trust jurisdiction by the voluntary act of the trustee in transferring the res to the settlor after the purpose of the trust had been fulfilled. If an express trust was created, and if the trial court was not divested of its jurisdiction over the trust by the trustee's act of transferring the rest to the settlor, then it will follow that the court's order vacating, for lack of jurisdiction, its first two orders was erroneous and must be reversed.
If an express trust was ever created, the requisite intent to create it, as well as the other essential trust elements, must be inferred from the following transactions between Archibald G. Bush, as alleged settlor-trustee and his wife's niece, Audrey Arnold Johnson (who died in 1953 and is herein referred to as Audrey or as the beneficiary). Bush, a major stockholder of the Minnesota Mining and Manufacturing Company (herein designated as 3M) and the chairman of its executive committee, motivated by a desire to give various nieces and nephews property which would yield them a fixed *40 income, in 1937 admittedly made an outright gift of some of the 3M corporate stock to Audrey. Shortly thereafter, Bush discovered that Audrey had sold the stock and spent the proceeds. The 1937 gift is not involved in the trust proceedings but is recited herein merely to provide a background for, and an aid to, an interpretation of the intent with which Bush made subsequent transfers of 3M stock for the benefit of Audrey.
In December 1941, Bush transferred to the name of Audrey 50 shares of the 3M common stock but did not deliver the new stock certificate to her. Again in December 1942, he similarly transferred to her an additional 50 shares of 3M stock. In both instances the transfer in registration was made on the records of the First Trust Company of St. Paul, transfer agent for the 3M company; but the uncontradicted evidence establishes that the new certificates were delivered by the transfer agent to Bush and that he thereafter kept them in his possession. When the 1942 stock transfer took place, on December 16 of that year, Bush wrote Audrey (whose married name was then Arnold) the following letter:
"Dear Audrey:
"I just wanted you to know that your Aunt Edyth and I are having put away for you, transferred to your name, 50 shares of 3M stock. I shall keep this certificate here along with the certificate transferred to you last year. It is registered in your name, care of W.B. Bassler, San Diego, so your dividend checks will flow in that direction. The next dividend, we hope, will come through next March. "I hope you and the Major will have as pleasant a Christmas as is possible during the war period.
 "Sincerely yours," (italics supplied).
May the above letter be construed as a trust instrument? In passing upon the basic question of trust or no trust, we must consider not only this letter and the two transfers of stock registration referred to therein but also the acts of the parties with the respect to the issuance in the name of Audrey of additional shares of stock resulting from a split-up by the 3M company of its common stock. In November 1945, by reason of a split-up of two shares for one, *41 100 additional shares were issued in Audrey's name and the certificate therefor was mailed by the transfer agent directly to Audrey who shortly thereafter sold these shares. When Bush learned that the certificate had been mailed to Audrey and that she had sold the 100 shares, he, in anticipation of another stock split-off, notified the company by letter that he held the two certificates for 50 shares each originally issued in the name of Audrey and requested that any new certificates for future issuances of split-off stock should be delivered to him. He stated that, by reason of Audrey's condition of health, he and Mrs. Bush did not like to have the stock certificates sent to her even though she received the dividends directly. This letter made no mention of the existence of any trust. When in 1950 there was a four-for-one split of the common 3M stock, the certificate for the new shares was delivered to Bush as per his request.
In 1950 or 1951 Audrey married Johnson. In order to change the registration of the stock to her new married name, Bush, without delivering the stock certificates to her, sent to her, for her execution, assignment blanks and stock powers. These assignments and stock powers were signed by Audrey and returned to Bush, who then arranged to have new certificates issued in her new married name. Again the transfer agent, upon the request of Bush, delivered the new certificates to him. All stock dividends were, however, at all times paid directly to Audrey until her death on October 5, 1953.
Upon Audrey's death, Bush had the stock certificates transferred back to his name. In February 1955, he petitioned the court for confirmation of his appointment as trustee, and in March 1955, for his discharge after the allowance and settlement of his account as trustee. On March 7, 1955, the court issued an ex parte order confirming Bush as trustee, and by a subsequent order of January 3, 1956, his accounts were settled and he was discharged. Both of these orders were vacated by an order of the court dated January 31, 1956. The appeals herein are from these orders and were, with the exception of the one by the special administratrix, taken prior to the expiration of the 30-day stay applicable to the vacating order.
*42 1. Does the 1942 letter from Bush to Audrey manifest an intent to create an express trust or merely an intent to make an outright gift? In passing on this issue it is to be borne in mind that no trust is created unless the settlor manifests, by external expression,[1] an intent to create that relationship which embraces the essential elements of a trust, and if, pursuant to such an existing and concurring intent,[2] he does in fact create that relationship, it is immaterial that in doing so he did not use the word "trust" or that he did not know the precise characteristics or elements of a trust.[3] No particular form and no specific words are necessary to create a trust.[4] Even though the settlor's language be inept, clumsy, or even unsuitable, it is adequate if it reveals an intent to create the incidence of a trust relationship.[5]
2-3. Although under the parol evidence rule (in the absence of fraud or other ground for reformation or rescission), extrinsic evidence may not be used to contradict or vary the settlor's written declaration of intent, it is nevertheless admissible in interpreting and clarifying a writing which is ambiguous and uncertain as to the settlor's intended meaning. Thus, for the sole purpose of resolving ambiguity, extrinsic facts and surrounding circumstances  inclusive of the conduct of the parties and any practical construction which *43 they themselves have applied to the writing[6]  may be considered in ascertaining the settlor's manifest intent.[7] Whether the extrinsic facts, as applied to an ambiguous writing, justifies an inference that the settlor intended to create a trust is a question of fact.[8] A trial court's finding that a settlor manifestly intended to, and did, create a trust may not be disturbed upon appeal unless the evidence as a whole does not reasonably sustain it, or unless, as a matter of law, the settlor's intended trust relationship is defective for failure to include one of the essential elements of a trust.[9]
4-5. When in the light of the extrinsic evidence as a whole, the ambiguity in the settlor's writing is clarified in a manner which reasonably sustains a finding of an intent to create a trust, the essentials of a trust relationship must clearly appear.[10] Once these essential elements appear from a fair consideration of the evidence as a whole, the trust should, in all its parts, be sustained, under the applicable law, when it can be done by any reasonable construction of the instrument creating it.[11] In order to constitute an express trust there must be: (1) a designated trustee subject to enforceable duties, (2) a designated beneficiary vested with enforceable rights, and (3) a definite trust res wherein the trustee's title and estate is separated from the vested beneficial interest of the benficiary.[12] Pursuant to M.S.A. 501.17, the trustee is possessed of the whole legal title and estate and the beneficiary, as his separate interest in *44 the res, has no title or estate therein but only a vested right on his part to enforce in equity  as a chose in action  the performance of the trust for his benefit.[13]
In applying these principles, we have no difficulty in concluding here that the 1942 letter, in the light of the surrounding circumstances and the practical construction placed on that letter by both Bush and Audrey, sustains a finding that Bush intended to create a trust relationship. Despite his general intention, the critical issue, with which we shall later deal, is whether as a matter of law he conveyed the entire title and estate to the trust res, as well as the beneficial interest therein, to Audrey, so that the essential separation of the legal estate from the beneficial interest is missing. Before dealing with this critical point, we shall consider what intent Bush manifested by his letter in the light of the surrounding circumstances.
The letter itself is not free of ambiguity. By his writing Bush tells Audrey that, although he has transferred the 3M stock to her name so that the dividends will flow to her, he has nevertheless put the stock away for her and that he will keep the stock certificates in his possession. Assuming for the nonce that he has not conveyed the entire estate and legal title to Audrey, the surrounding circumstances indicate a trust purpose. Significantly, after Audrey had dissipated the 3M stock, which he had transferred to her on the books and the certificate for which he had delivered to her in 1937 as an outright gift, Bush sought in 1941 and 1942 to adopt an arrangement whereby she would receive the income from the stock but would be unable to dissipate the source of the income, the stock itself. In carrying out the new arrangement, he had new stock certificates issued and registered in her name on the corporate books but he made no delivery to her of the certificates but kept them under his control. Although he provided for the needs of other members of *45 the family at the same time, the new procedure was adopted only with respect to Audrey.
His manifest intention to exercise exclusive domination and control of the stock, and to give Audrey only the beneficial interest of the dividend income, is demonstrated by his subsequent action in dealing with the additional shares resulting from a corporate split-up of common stock. The corporate transfer agent had no knowledge of the new plan and therefore sent the certificate for the first split-off shares to Audrey directly as the registered owner of record. Audrey promptly sold these shares as she had done with the shares given to her in 1937. Obviously, Bush had overlooked the fact that the transfer agent, in the absence of instructions, would send the certificates for the split-off stock directly to her. When he learned what had taken place, he took corrective action before the next stock split-up occurred; by letter he instructed the transfer agent to send the new certificates to him. In this letter, Bush made no mention of a trust but stated that the arrangement was desirable because Audrey was ill. His failure to explain his conduct on the basis of a trust is of little significance; what is important is that he insisted on an arrangement which gave him possession and control of the new stock.
When Audrey married Johnson, Bush had new certificates issued in her name but again he was careful to retain possession of the certificates. Audrey's conduct in not protesting his retention of the stock certificates, and in executing and forwarding to Bush upon his request the necessary assignments and powers of attorney so that new certificates could be issued in her name without delivery of the new certificates to her, confirms the fact that she understood that the arrangement was one which gave Bush the exclusive control of the stock and that she was in fact only an income beneficiary. The testimony by the secretary of Bush, who had the responsibility of carrying out the mechanics of the transaction, confirms the arrangement. Thus, Bush and Audrey, by their own practical construction, in effect recognized the existence of a trust. We hold, therefore, that the extrinsic evidence, as applied to the 1942 letter, reasonably *46 sustains the court's finding that a trust relationship had been created with the settlor as the trustee and Audrey as the beneficiary of a dividend income derived from the 3M stock which constituted the trust res.
6. Does the intended trust fail, however, because the essential element of a separation between the trustee's estate and the beneficial interest is missing? Did Bush retain for himself as trustee the entire ownership of the stock and give Audrey only a beneficial interest, or did he, by having the stock registered in her name on the corporate books, give her the absolute ownership of the stock? If he did the latter, there is no trust since Audrey then, as a matter of law, became a donee of the stock instead of a mere holder of a beneficial interest. We have, therefore, this question: When a stockholder turns in his certificate of stock and has a new certificate issued and recorded on the corporate books in the name of another as transferee, but has the new certificate delivered into his own hands and retains possession thereof until the death of the recorded transferee, does the legal and equitable title to the stock remain in the transferor or does it pass  without any actual delivery of the new certificate  to the transferee as a gift inter vivos?
Whether a gift is completed by a bare transfer on the books of the corporation, when the transferor takes and retains possession of the new certificate, is an open question in Minnesota. Among the other jurisdictions there is a division of authority.[14] The decisions *47 holding that a transfer on the books of the company without a delivery of the new certificate conveys the title proceed on the theory that a record transfer performs the same function which an actual delivery would perform in the case of a chattel. The courts so holding regard the transfer on the corporate books as clear evidence of a design to part with the title in favor of another; a corporate record of a transfer, they assert, is the best evidence of ownership and a stock certificate is but secondary evidence thereof and is useful only for the purpose of transfer.[15]
In Minnesota we have never held that a stock certificate is but secondary evidence of ownership. It is the law of this state that a transfer of stock is good between the parties and that the title passes to the purchaser without the transfer being entered on the corporate books.[16] Although it does not necessarily follow as a corollary to this rule that there is no passage of title when the registration is changed but the certificate is not delivered, it does, however, indicate that the title under our decisions normally follows the certificate. Prior to our adoption of the Uniform Stock Transfer Act in 1933,[17] this court held that the recording of stock transfers on the corporate books is required for the purpose of notice to the corporation and for its benefit.[18] There is nothing in the Uniform Stock Transfer Act which changes the purpose of this rule. The statutory requirement (§ 302.02)[19] that the title to a certificate, and to the shares represented thereby, can be transferred only by a delivery of the certificate endorsed either in blank or to a specified person (or when accompanied by a separate written assignment or power of *48 attorney), emphasized the importance of the certificate as a badge of title to the shares.[20]
"The mere direction by the owner to the corporation to change the corporate records regarding ownership, followed by such change to the name of another, would seem to be inadequate proof of a gift, when not followed by delivery of the new certificate. The change of the corporation transfer books is not ordinarily necessary to a completed gift or conclusive evidence that a donation has occurred." 1A Bogert, Trusts and Trustees, § 142, p. 13.
In view of the basic importance of the certificate as a badge of ownership and as a symbol of a transfer of title between the parties, and further in view of the fact that the recording of a transfer of stocks on the corporate books, by the great weight of authority,[21] is (in the absence of an express statute to the contrary[22]), for the benefit of the corporation, we reject the authorities which hold that *49 a bare transfer of the stocks on the corporate records, without a delivery to the transferee of the new certificate, passes the legal and equitable title to the stock. We adopt the rule, therefore, that a bare transfer of stock on the books of a corporation, and the issuance of a new certificate in the name of another as transferee, all at the request of the original stockholder, does not of itself pass the legal and equitable title to the stock to the transferee where the transferor takes and retains possession of the new certificate and does not in any manner make a delivery thereof to the transferee. In the instant case, we hold therefore that the title to the stock did not as a matter of law vest in Audrey and that the finding upon the evidence that Bush retained the legal and equitable title as trustee must be sustained and is controlling.
7. Was the trial court without jurisdiction? Did the trustee upon completion of the trust purpose, by his voluntary act of procuring the transfer of the trust res (the 3M stock) back to himself as remainderman, so completely terminate the trust that it ceased to exist for all purposes with the result that there was no trust existing over which the court could exercise jurisdiction when it purported to enter orders confirming the trust, allowing the account, and discharging the trustee? Obviously, the answer must be in the negative. Once an express trust has been created, the trustee is subject to the jurisdiction of the court and, pursuant to that jurisdiction, he can be compelled to render to the court an account of his administration of the trust, and no act on his part, such as a dissipation or a conveyance of the trust res, can divest the court of its jurisdiction and thus render him immune from court supervision in the discharge of his fiduciary responsibility. Any other rule would defeat the basic purpose of the principle that a trustee is always accountable for his administration of the trust property.
8. There is no merit in the contention that the court's proceeding is wholly in rem and that, once the trustee has disposed of the trust res, there is nothing to which the court's jurisdiction can attach. It is true that § 501.33 provides that once a trustee has been confirmed thereunder the district court shall have jurisdiction of the trust *50 as a proceeding in rem. This section, however, is purely procedural and qualified by § 501.38 which specifically states that nothing in §§ 501.33 to 501.37 shall be deemed to limit or abridge the power or the jurisdiction of the district court over trusts and trustees. In other words, as pointed out by this court in Wertin v. Wertin, 217 Minn. 51, 13 N.W. (2d) 749, 151 A.L.R. 1302, these statutory sections are wholly procedural and do not limit the court's jurisdiction in administering trusts.
9. Not only can the trustee be compelled to give an account of his trust administration, but he himself as trustee has an interest in the settlement of his accounts and has a right to insist that the accounts shall be examined and settled by the proper court. This right is important to the trustee since a settlement gives him protection against further litigation with respect to matters in the accounting and give him the defense of res judicata as to those matters.[23]
That a trustee has it in his power at any and all times to come of his own motion and secure from a court of equity a settlement of his account is a principle so well settled that it was upheld in Dyer v. Waters, 46 N.J. Eq. 484, 19 A. 129, without statement of authority. More recently another New Jersey case held that correlative with a duty to keep and render accounts is the right to secure repose by judicial settlement. In re Rothenberg, 129 N.J. Eq. 377, 19 A. (2d) 639.[24] The fact that the Minnesota statutory procedure provides that a trustee shall first secure his confirmation as a trustee under § 501.33 before rendering his account in no manner abridges his right to secure a settlement of his trust stewardship.[25]
*51 It follows that the trial court's order vacating its first two orders for lack of jurisdiction was erroneous and must be reversed. The orders of the trial court, one confirming the appointment of a trustee and the other allowing the trustee's account and discharging him, are affirmed.
Affirmed in part and reversed in part.

UPON APPEAL FROM CLERK'S TAXATION OF COSTS.
On April 5, 1957, the following opinion was filed:
PER CURIAM.
As To Costs and Disbursements Awarded To Appellant Bush
Objector contends that the trustee is not entitled to an award of his costs and disbursements because M.S.A. 549.14 provides that, in actions prosecuted or defended by a trustee, costs and disbursements shall be chargeable to the trust estate unless the court directs them to be charged against the trustee personally because of mismanagement or bad faith. Pursuant to our holding in Malcolmson v. Goodhue County Nat. Bank, 198 Minn. 562, 571, 572, 272 N.W. 157, 162, we do not here have an action prosecuted or defended by the trustee within the meaning of this statute but instead a special proceeding brought by a trustee asking for the allowance of his account and for his discharge which is concluded by a final order. It is settled that *52 costs may be taxed by the supreme court in favor of the prevailing party upon an appeal from the final order in such proceedings. In re Petition of Schaller, 193 Minn. 604, 615, 259 N.W. 529, 826; Malcolmson v. Goodhue County Nat. Bank, supra.
There is no merit in the contention that the brief filed in behalf of appellant Bush contained unnecessary, irrelevant, and immaterial matter so as to justify or require a reduction in the allowance of disbursements for printing. See, Albert Lea Ice & Fuel Co. v. United States Fire Ins. Co. 239 Minn. 198, 205, 58 N.W. (2d) 614, 619; see, also, In re Guardianship of Maloney, 234 Minn. 1, 12, 48 N.W. (2d) 313, 49 N.W. (2d) 576.
The disbursement item of $20 awarded to the trustee for the bond premium is not excessive since such item covered two annual bond premiums. The clerk's award of $117.85 for printing trustee's reply brief is, however, reduced by one-third since only two-thirds of such reply brief was reasonably necessary.

As To Costs and Disbursements Awarded To Appellant Bassler
Objector contends the clerk's award of taxation of costs to appellant Bassler should be disallowed. Where a party litigant has no financial interest or other right which could be affected either adversely or favorably by the outcome of the litigation, he is a mere interloper, and if he takes an appeal, or participates in an appeal taken by others, he is not entitled to an award of his costs and disbursements. Appellant Bassler admittedly, when he took his appeal, had no interest or right which was in need of either advancement or protection. In fact, Bassler could be affected adversely only if his own contentions prevailed upon appeal. Moral indignation at the possible outcome of litigation is not of itself sufficient to give a litigant standing as a bona fide appellant entitled to costs and disbursements. The award of costs and disbursements to Bassler is disallowed in its entirety.
NOTES
[1] An undisclosed intention is wholly ineffective since it is not admissible of proof in a judicial proceeding. See, Restatement, Trusts, § 4, comment a, and § 23, comment a; 1 Scott, Trusts (2 ed.) § 23.
[2] The expression of the intent and the formation of the trust relation must concur. A subsequent intention is ineffective. See, Restatement, Trusts, § 4, comment a; 1 Bogert, Trusts and Trustees, § 45.
[3] Farmers State Bank v. Sig Ellingson & Co. 218 Minn. 411, 418, 16 N.W. (2d) 319, 323; 19 Dunnell, Dig. (3 ed.) § 9884; 1 Scott, Trusts (2 ed.) § 2.8.
[4] Jordan v. Jordan, 193 Minn. 428, 431, 432, 259 N.W. 386, 388; 19 Dunnell, Dig. (3 ed.) § 9884; Restatement, Trusts, § 23, comment a; 1 Bogert, Trusts and Trustees, § 45; 1 Scott, Trusts (2 ed.) § 24.
[5] It has been appropriately said: "A bear well painted and drawn to the life is yet the picture of a bear, although the painter may omit to write over it, `This is the bear.'" Fox v. Faulkner, 222 Ky. 584, 586, 1 S.W. (2d) 1079, 1080, quoting from Prewitt v. Clayton, 21 Ky. (5 T.B. Mon.) 4, 5.
[6] Farmers State Bank v. Sig Ellingson & Co. 218 Minn. 411, 16 N.W. (2d) 319.
[7] Jordan v. Jordan, 193 Minn. 428, 259 N.W. 386; Farmers State Bank v. Sig Ellingson & Co. supra; 19 Dunnell, Dig. (3 ed.) § 9884; Restatement, Trusts, § 38; 1 Scott, Trusts (2 ed.) § 12.2; 1 Bogert, Trusts and Trustees, § 51.
[8] Jordan v. Jordan, supra.
[9] Jordan v. Jordan, supra.
[10] Farmers State Bank v. Sig Ellingson & Co. supra.
[11] Stacey v. Taylor, 196 Minn. 202, 209, 264 N.W. 809, 813; Mattson v. United States Ensilage Harvester Co. 171 Minn. 237, 243, 213 N.W. 893, 895; 19 Dunnell, Dig. (3 ed.) § 9888.
[12] Wertin v. Wertin, 217 Minn. 51, 13 N.W. (2d) 749, 151 A.L.R. 1302; Farmers State Bank v. Sig Ellingson & Co. supra.
[13] First and American Nat. Bank v. Higgins, 208 Minn. 295, 311, 312, 293 N.W. 585, 594; Farmers State Bank v. Sig Ellingson & Co. 218 Minn. 411, 416, 417, 16 N.W. (2d) 319, 322; Merriam v. Wagener, 74 Minn. 215, 220, 77 N.W. 44, 45; see, 1A Bogert, Trusts and Trustees, § 183; 2 Scott, Trusts (2 ed.) § 130.
[14] The leading cases holding that a mere transfer on the books of the corporation, without delivery of the certificates, passes title are: Robert's Appeal, 85 Pa. 84; Chicago Title & Trust Co. v. Ward, 332 Ill. 126, 163 N.E. 319; Phillips v. Plastridge, 107 Vt. 267, 179 A. 157, 99 A.L.R. 1074; Thomas v. Thomas, 70 Colo. 29, 197 P. 243; Copeland v. Craig, 193 S.C. 484, 8 S.E. (2d) 858.

Leading cases to the contrary are: Besson v. Stevens, 94 N.J. Eq. 549, 120 A. 640; Figuers v. Sherrell, 181 Tenn. 87, 178 S.W. (2d) 629, 152 A.L.R. 420; Hudgens v. Tillman, 227 Ala. 672, 151 So. 863; see, Barnhouse v. Dewey, 83 Kan. 12, 109 P. 1081, 29 L.R.A.(N.S.) 166; Southern Industrial Institute v. Marsh (5 Cir.) 15 F. (2d) 347, certiorari denied, 273 U.S. 747, 47 S. Ct. 449, 71 L. ed. 872; White v. White, 229 Ky. 666, 17 S.W. (2d) 733.
[15] Robert's Appeal, supra, and associated cases cited in preceding footnote.
[16] Dennistoun v. Davis, 179 Minn. 373, 378, 229 N.W. 353, 355, and cases therein cited; 4 Dunnell, Dig. (3 ed.) § 2044.
[17] L. 1933, c. 331 (now M.S.A. 302.02 to 302.22).
[18] Dennistoun v. Davis, supra.
[19] This section is identical with § 1 of the Uniform Stock Transfer Act. 6 Uniform Laws Annotated, § 1.
[20] The Commissioners' note to § 1 of the Uniform Stock Transfer Act (identical with the provisions of M.S.A. 302.02) reads as follows (6 Uniform Laws Annotated, p. 2):

"The provisions of this section are in accordance with the existing law (see Cook on Corporations, section 373 et seq.), except that the transfer of the certificate is here made to operate as a transfer of the shares, whereas at common law it is the registry on the books of the company which makes the complete transfer. The reason for the change is in order that the certificate may, to the fullest extent possible, be the representative of the shares. This is the fundamental purpose of the whole act, and is in accordance with the mercantile usage. The transfer on the books of the corporation becomes thus like the record of a deed of real estate under a registry system." (Italics supplied.)
Although the soundness of the commissioner's analogy between a corporate record of a stock transfer and the recording of a real estate deed may be questioned in certain respects, it is significant to note that the act of recording a real estate deed merely raises a presumption of the deed's delivery. See, Babbitt v. Bennett, 68 Minn. 260, 71 N.W. 22; Hooper v. Vanstrum, 92 Minn. 406, 100 N.W. 229; 5 Dunnell, Dig. (3 ed.) § 2668, and cases therein cited.
[21] Figuers v. Sherrell, 181 Tenn. 87, 93, 94, 178 S.W. (2d) 629, 631, 152 A.L.R. 420.
[22] See, 13 Am. Jur., Corporations, §§ 352 to 354; M.S.A. 302.02.
[23] M.S.A. 501.35; Restatement, Trusts, §§ 172 and 260; 4 Bogert, Trusts and Trustees, § 969; 3 Scott, Trusts (2 ed.) § 260; Lewin, Trusts (15 ed.) pp. 403, 404.
[24] See, also, United Towns Bldg. & Loan Assn. v. Schmidt, 23 N.J. Super. 239, 92 A. (2d) 844.
[25] None of the cases cited by the parties to this appeal are actually in point. In First Trust Co. v. Matheson, 187 Minn. 468, 246 N.W. 1, 87 A.L.R. 478, the plaintiff trustee asked the court to establish the validity of a trust. It was held only that substituted service on the beneficiary confers jurisdiction to make a determination binding on the beneficiary as to the ownership of the trust res. In State ex rel. St. Paul & Duluth R. Co. v. Young, 44 Minn. 76, 46 N.W. 204, an assignee in insolvency had joined in a deed to a trustee, selected by the debtors and the creditors, and the assignee had been discharged. It was held that the court lost jurisdiction over the property on execution of the deed. There was, however, no question as to jurisdiction over the trust or the trustee. In Hill v. Moors, 224 Mass. 163, 112 N.E. 641, the trustees did not ask for instructions but instead asked the court to ratify and confirm acts already performed by them under the declaration of trust; the court declined the relief asked because the record failed to disclose the origin of the $100,000 trust fund and further because the trustees desired to determine the validity of the title to certain parcels of real estate which the trustees had received and conveyed and many of which were in fact owned by different persons who were not parties to the proceeding. Obviously, under the circumstances in the Moors case the court was without jurisdiction to grant the relief asked.